THE TEXAS COMPANY ET AL. V. NELSON DAVIS ET AL.

No. 3679.   Decided June 30, 1923, October 31, 1923.

(254 S. W., 304.)

### 1.—Oil and Gas—Conveyance—Conditional Fee.

A conveyance of the oil and gas in land for the purpose and with the right to mine for and produce same, subject to payment of royalty, to continue on development of a paying well, for twenty-five years and as long as oil should be produced in paying quantities, gave the grantee, on such development, a title in fee to such minerals conditional only and subject to forfeiture by his abandonment of production and further effort at development.   (Pp. 330-335).

### 2.—Same—Abandonment in Law.

Evidence here considered is held to show abandonment, by the grantee of oil mining rights, of any effort to develop or produce oil justifying a peremptory charge based on forfeiture of his title.   (P. 335).

### 3.—Same—Case Stated.

The owner of land conveyed to a grantee the oil and other minerals therein with right to mine, produce and market same, paying the grantor a royalty thereon.   Drilling was to be commenced within two years or annual rental paid grantor if postponed, such rental to cease on production beginning.   On discovery of oil the grant was to continue for twenty-five years and as much longer as it could be produced in paying quantities.   It was recited that such grant was not intended as a mere franchise, but as a conveyance of the property for the purpose mentioned.   Grantee's assigns developed a paying oil well; but, this failing, abandoned production and all further effort at development.   *Held*, that the grant being for the purpose of development and production of oil by the grantee and royalties thereon to the grantor, the title to the minerals acquired by the latter through production of a temporarily paying well was upon condition, to be enjoyed only while the work of mineral exploration and production was carried on.   It was forfeited by abandonment of all further effort at production or development, and reconveyance to the grantor was not then required to enable him or his assigns to contract with another who, under this later arrangement, by sinking deeper wells, developed valuable oil production on the land.   In this the first grantee and his assigns had no interest.   (Pp. 326-336).

### 4.—Cases Discussed.

Stephens County v. Mid-Kansas Oil Co., 113 Texas, 160;   Munsey v. Marnet Oil and Gas Co., 113 Texas, 212;   Robinson v. Jacobs, 113 Texas, 231;   Texas & P. Ry. Co. v. Durrett, 57 Texas, 48;   and other cases are approved and followed.   Grubb v. McAfee, 109 Texas, 531, is criticized and modified.   (Pp. 331, 335).

### 5.—Contract—Forfeiture—Avoidance by Paying Rent.

A conveyance of oil in land required the grantee to commence drilling therefor within two years or the grant to become void; but such forfeiture could be avoided by the grantee by payment of rent at $10.00 from year to year, until shipments from the mine begun.   *Held*, that this provision applied only to excusing the beginning of work within the specified time.

That the development of a temporarily paying well, as a substitute for rental payments, did not prevent the forfeiture of the grantee's rights by his subsequent abandonment of all efforts at further development or production. (Pp. 333, 336).

### 6.—Limitation—Removal of Cloud from Title.

Cloud upon title being a continuing injury, action for its removal is likewise continuing and never barred while the cloud exists. (P. 336).

Error to the Court of Civil Appeals for the First District, on appeal from Brazoria County.

Davis and others sued the Texas Company and others. Judgment was for defendants in accordance with a peremptory instruction. Plaintiffs appealed and the case was reversed and remanded with instructions favorable to their contention. Defendants, Texas Co. et al, thereupon obtained writ of error.

*Baker, Botts, Parker & Garwood, Louis J. Wilson, Terry, Cavin & Mills, C. C. Wren, C. R. Wharton,* and *Lee, Lomax & Wren,* for plaintiffs in error.

The majority of the Court of Civil Appeals erred in holding that the Equitable Company, or any persons claiming under it, ever acquired any right or interest in the Arnold land in controversy under the lease to Underwood or otherwise that was not subject to abandonment; or that could not be lost by abandonment, or that required a written instrument to divest title thereto.    Grubb v. McAfee, 109 Texas, 527, 212 S. W., 464; Munsey v. Marnett, 199 S. W., 689; Fisher v. Crescent Oil Co., 178 S. W., 905; Pierce-Fordyce Oil Assn. v. Woodrum, 188 S. W., 245; Oil Co. v. Teel, 95 Texas, 586; Benavides v. Hunt, 79 Texas, 383; Corsicana Pet. Co. v. Owens, 222 S. W., 154; Texas Co. v. Curry, 229 S. W., 643; Hall v. McCleskey, 228 S. W., 1004; Bailey v. Williams, 223 S. W., 311; Witherspoon v. Staley, 156 S. W., 557; Conkling v. Krandusky, 112 N. Y. Supp., 13; Sull v. Oil Co., 63 W. Va., 329, 61 S. E., 312; Parish Fork Oil Company v. Bridgewater, etc., Company, 51 W. Va., 583, 42 S. E., 655, 59 L. R. A., 566; Wilmore v. Brown, 147 Fed., 931, S. C. on appeal, 153 Fed., 143; Venture Oil Company v. Fretts, 25 Atl., 732; Steelsmith v. Gartlan, 29 S. E., 978, 44 L. R. A., 107; Calhoun v. Neely, 50 Atl., 968; Aye v. Philadelphia Company, 193 Pa., 451, 44 Atl., 555, 74 Am. St. Rep., 696; Florence Ref. Company v. Orman, (Colo. 1903) 73 Pac., 628; Rorer v. Trout, 2 S. E., 713; Barnhart v. Lockwood, (Pa. 1892) 25 Atl., 237; Cowan v. Radford, (Va. 1887) 3 S. E., 120; Harris v. Michael, (W. Va. 1912) 73 S. E., 935; Highfield v. Kirk, (Pa. 1915) 93 Atl., 815; Smith v. Root, 30 L. R. A. (N. S.), 179; Chandler v. French, L. R. A., 1915-B., 565; Eastern Ky. Min. Company v. Swann-Day Company, 46 L. R. A., (N. S.) 678; Bluestone Coal Co. v. Bell, 18 S. E., 493. Paine v. Griffiths, 86 Fed., 452; Toothman v. Courtney,

58 S. E. 916; Hawkins v. Pepper, 23 S. E., 434; Crawford v. Ritchey, 27 S E., 220; Logan v. Gas Company, 126 Fed., 623; Tennessee v. Brown, 131 Fed., 696; McCall v. Bear Creek Company, (Ia.) 143 N. W., 532; Gadbury v. O. & I. Con. Company, 67 N. E. Rep., 259; Ohio Valley, etc., Company v. Irwin Dev. Company, (Ky.) 212 S. W., 110; Sledge v. Stolz (Cal.) 182 Pac., 340.

The majority of the Court of Appeals erred in holding that abandonment by the Equitable Mining Company and those holding under them, was not shown as a matter of law and in holding that such question was for the jury; and erred in this behalf in holding that the trial court erred in directing the jury to find for defendants, these plaintiffs in error, on such ground. Same authorities.

The court erred in holding that the Arnold-Underwood lease, dated February 23rd, 1901, hereinabove set out, vested in Underwood and his assigns the legal title in fee to 9/10 of all the oil, gas, coal and other minerals in and under the land described in the lease for a period of twenty-five years and as much longer as such minerals can be produced thereon in paying quantities, because on its face the instrument is no more than an oil lease and it is apparent from an examination of same, together with the facts and circumstances surrounding the parties at the time of its execution, that it was intended only as a lease for the purposes stated in the instrument. Same authorities, particularly Pierce-Fordyce Oil Assn. v. Woodrum, 188 S. W., 245.

As to the effect of the rental provision on the grantee's obligation. Brown v. Vandergrift, 80 Pa. St., 142; Bettman v. Harness, 26 S. E., 275.

*Presley K. Ewing, McDonald Meachum,* and *Phillips, Townsend & Phillips* (A. R. Rucks and W. J. Howard, of counsel) for defendants in error.

The interest acquired under the instrument to Underwood was the legal title in fee to the oil and other minerals as land; for that, using the language of the opinion in the Daugherty case, it was "No mere demise of the premises for a given period as in the case of an ordinary leasehold," nor simply "a grant of the right to prospect upon the land for oil or gas and reduce these substances to possession and ownership," but it was a conveyance of "the oil, gas and other minerals in and under the land as property," so that "the grant amounted to a defeasible title in fee to the oil and gas in the ground." Texas Co. v. Daugherty, 107 Tex. 226, and cases cited; Southern Oil Co. v. Colquitt, 69 S. W. 169; Houston Oil Co. of Texas v. Hamilton, 109 Tex. 270; Chapman v. Dearman (Tex. Sup.), 229 S. W., 1112; Swayne v. Lone Acre Oil Co., 98 Tex. 607; 27 Cyc., 687, 688; Barringer & Adams on Law of Mines & Mining, p. 36; 1 Thornton's Oil & Gas, sec. 19-20; Scott v. Laws (Ky.), 215 S. W. 81. Also, following the

Daugherty and Colquitt cases, these among others from the Courts of Civil Appeals, McEntire v. Thomason, 210 S. W. 565, 2nd District, per Chief Justice Conner; Thomason v. Upshur Co., 211 S. W., 325, 327, 329; Crabb v. Bell, 220 S. W. 624, 8th District, per Justice Higgins; the adversely cited case, Munsey v. Marnet Oil & Gas Co., 199 S. W., 689, 5th District, per Justice Rasbury; Key v. Big Sandy Oil & Gas Dev. Co., 212 S. W. 301, 2nd District, per Justice Dunklin; Smith v. Womack, 231 S. W. 843.

Independent of the dollar, and treating the test drilling and hoped-for royalties as the main consideration to the Arnolds, when the drilling requirements were complied with at the large cost and outlay, it was as though the Arnolds had said, "we grant, and in exchange you drill at your cost," thus supplying the most ample consideration of "benefit" and "detriment," see Page v. Payne, 41 Tex. 146; 13 Corp. Juris, pp. 311, 334-335; 9 Cyc. 311, 313, 320; Duff v. Duff (Ky.), 218 S. W. 1009, and cases cited; 21 Am. & Eng. Ency. of Law, 2nd ed., 926; Fisher v. Crescent Oil Co., 178 S. W. 907; National Oil & Pipe Line Co. v. Teel, 95 Tex. 586-87; Von Hatzfeld v. Haubert, 224 S. W. 222-223; and see for analogy, White v. Cole, 87 Tex. 500, 502, and Stitzle v. Evans, 74 Tex. 599, citing Russell v. Kirkbridge, 62 Tex. 457; Archer's Oil & Gas, p. 344, and (3) the contingent future consideration of hoped-for royalties could not affect the executed character of the grant, see Perry v. Scott, 51 Pa. St. 119; Bortz v. Bortz, 48 Pa. St. 382, 86 Am. Dec. 603; Henderson v. Beaton, 1 Tex. Un. Cas., 17, 22; Owen v. New York etc. Land Co., 11 Tex. Civ. App. 284, 32 S. W. 189.

A legal fee title to land, such as was plainly and unmistakably acquired to the oil and other minerals and under the instrument to Underwood, is by a consensus of authority, overwhelming and undeniable, not subject to be divested and lost by abandonment or without a written instrument, in the absence of limitation or estoppel.

(a)     Cases where the legal title was held under conveyances— Dikes v. Miller, 24 Texas. 417, 424; 2 Washburn on Real Property, 6th ed., sec. 1888; Tiedeman on Real Property, enlarged ed., sec. 739, p. 603; 1 Cyc., 6-7; 1 Corpus Juris, pp. 9-10; 1 Words & Phrases, First Series, p. 11; Barrett v. Kansas & T. Coal Co. (Kan.), 79 Pac. Rep. 150; East Tenn. Iron & Coal Co. v. Wiggins (U. S. App.), 68 Fed. 446; Tenn. Oil, Gas & Mineral Co. v. Brown (U. S. App.), 131 Fed. 696; Mayor of Phila. v. Riddle, 25 Pa. St. 259; Putnam v. Tyler (Pa.), 12 At. 43; Williamson v. Jones (W. Va.), 38 L. R. A. 701; Perkins v. Blood, 36 Vt. 273; Sharkey v. Candiana (Or.), 85 Pac. 219, 224; Sowles v. Minot (Vt.), 73 Atl. 1025, 1029; Pearce v. Ford, 124 La. 851, 853, 50 So. 771; Carmichael v. Arkansas Lbr. Co. (Tenn.), 152 S. W. 286, 287-288; Calloway v. Sanford (Tenn.), 35 S. W. 776, 778; Kreamer v. Voenida, 213 Pa. St. 74, 80, 62 Atl. 518; Caledonia Co. Grammar School v. Kent. (Vt.), 77 Atl. 880; Glynn v. Maxfield, 75

N. H. 482, 484, 76 Atl. 196, and other cases cited in the notes to the above texts, which we do not cite separately as we have not had access to them.

(b)   Cases where the legal title was held by limitation.   Note to Tarver v. Deppen, 24 L. R. A. (N. S.) 1161; McGregor v. Thompson, 7 Texas Civ. App., 32; Branch v. Baker, 70 Tex. 190, 7 S. W. 808; Williams v. Rand, 9 Tex. Civ. 631, 30 S. W. 509; Lamberida v. Barnum (Tex. Civ. App.), 90 S. W. 698, Barrett v. McKinney (Tex. Civ. App.), 93 S. W. 240.

That the legal title to land cannot be divested by the most formal parole or verbal agreement of rescission or surrender, but only by a writing sufficient to pass the title, Dial v. Crain, 10 Tex. 444; Sprague v. Haines, 68 Tex. 216; Masterson v. Little, 75 Tex. 682, 697, and to the same effect, Thornton's Law of Oil & Gas, 3rd ed., vol. 1, sec. 165.

That legal title to land cannot be lost by any neglect or failure to pay taxes or inaction of any sort, so long as there is no fraud amounting to estoppel (29 Tex. 71-73), and no adversely acquired title by limitation, see Williams v. Conger, 49 Tex. 582; Murphy v. Welder, 58 Tex. 236; Mast v. Tibbles, 60 Tex. 301; Moss v. Berry, 53 Tex. 632.

That the rule of abandonment being inapplicable to a legal title to land must necessarily prevail, as has often been held, where the land is minerals as well as where it is surface, for there could be no difference in principle whether the severance of the estate is lateral or longitudinal, see Barringer & Adams on the Law of Mines & Mining, p. 36; 27 Cyc. 687, 688; Thornton's Oil & Gas, sec. 19, 20, and the following mining cases, Scott v. Laws (Ky.), 215 S. W. 81; E. Tenn. Iron & Coal Co. v. Wiggins (U. S. App.), 68 Fed. 446; Tenn. Oil, Gas & Mineral Co. v. Brown (U. S. App.), 131 Fed. 696; Barrett v. Kans. & Tex. Coal Co. (Kan.), 79 Pac. 150.

It is now settled that such rental provision is valid and enforceable, at least during the period that rentals are being received, see Corsicana Petroleum Co. v. Owens, 110 Tex., 568, 571; Southwestern Oil Co. v. Kersey (Okla.), 195 Pac. 120; Skien v. Junction Oil & Gas Co. (Okl.), 193 Pac. 988, and the following from the Court of Civil Appeals, Lone Star Gas Co. v. McCullough, 220 S. W. 1114, 1116; Broyles v. Gilman, 222 S. W. 685; Bost v. Biggers Bros., 222 S. W., 1112, 1115; McCallister v. The Texas Co., 223 S. W. 859, and McKay v. Tally, 220 S. W. 167.

By the consensus of authority, it is held that while the grantors are accepting rental, or what was here the equivalent for the remainder of the term, the completion of a well, they cannot complain of delay in drilling, see Carper v. United Fuel Gas Co. (W. Va.), 89 S. E. 12, the court saying, "No implied covenant on the part of an oil or gas lessee for diligent operation at all, under such conditions, has ever

been suggested or declared by this or any other court." See also McNutt v. Whitney (Ky.), 232 S. W. 386.

No obligation to drill can be implied where the express language of the instrument is, as above, inconsistent therewith, at least to the extent as stated. Houston Oil Co. of Texas v. Hamilton, 109 Tex. 271; Carper v. United Fuel Gas Co. (W. Va.), 89 S. E. 12.

At the time Eilers performed the business act involved in the release to Arnold, the company had not been for about four years in active business, and by non-payment of its franchise tax was forbidden from doing any act of business, so that it had then no authority to do this or any other act of business, and what it could not do for itself Eilers could not do for it; and because the facts attending the obtention of the release, coupled with the testimony of practically every stockholder and director, none of whom had ever heard of the transaction except Eilers himself, made it manifestly clear that there was never any directors' or stockholders' authorizing action, but that the instrument was obtained from Eilers alone.

Mr. Justice GREENWOOD delivered the opinion of the court.

Defendants in error sued plaintiffs in error to recover the oil, gas, and other minerals, with appurtenant surface rights, in 76-1/2 acres of the Josiah H. Bell league of land near West Columbia in Brazoria County, subject to royalties. Plaintiffs in error filed answers containing pleas of not guilty and special pleas, and also filed a cross-action seeking cancellation of the instruments under which defendants in error claimed. Defendants in error plead limitation of four years in bar of the cross-action.

The District Court rendered judgment for plaintiffs in error, in the suit against them and on their cross-action, after peremptorily directing a verdict for them. On appeal, the Honorable Court of Civil Appeals reversed the judgment of the District Court and remanded the cause, with instructions to enter judgment for defendants in error for the oil, gas, and other minerals in controversy, and then to try the issues joined as to damages, etc. Special Chief Justice Sonfield dissented, concluding that the judgment of the District Court was correct. Seeking revision of the judgment of the Court of Civil Appeals, plaintiffs in error applied for and were granted a writ of error.

On February 23, 1901, W. F. Arnold and wife, Kate Arnold, owned 81-1/2 acres of land, which embraced the 76-1/2 acres containing the oil, gas, and other minerals involved in this suit. On that day, they executed an instrument, which Jno. C. Underwood also signed and acknowledged, in words as follows:

"Know all men by these presents: That I, W. F. Arnold of Brazoria County, Texas, the party of the first part, in consideration of the sum of $1.00 paid by Jno. C. Underwood, party of the second part,

the receipt of which is hereby acknowledged and the further consideration hereinafter mentioned, have granted, bargained, sold and conveyed, and do by these presents grant, bargain, sell and convey unto the said party of the second part, heirs and assigns, all of the oil, gas and coal, and other minerals in and under the following described land, together with the right of ingress and egress at all times for the purpose of drilling, mining and operating for minerals, and to conduct all operations and lay all pipe necessary for the production, mining and transportation of the oil, gas, water, coal or other minerals, with the right to use sufficient water, gas or oil to operate said property and shall have the right to remove all machinery, fixtures and improvements placed thereon at any time, reserving, however, to the party of the first part, the equal one-tenth of all oil produced and saved upon said premises, to be delivered in the pipe line to the credit of the party of the first part free of charge. If coal is found, the parties of the second part agree to pay the first party four cents per ton for every ton of the same that is mined and marketed, payable quarterly; if gas or other minerals are found, second parties agree to pay the first party one-tenth for the product each year, payable quarterly for the product of each well, while the same is being used off the premises; and the party of the first part by furnishing his own pipe and connections shall have sufficient gas free of cost for use in one dwelling house on the premises, so long as gas is utilized off the premises, but at his own risk. Whenever first party shall request it, second party shall bury all oil and gas lines and pay all damages done to the growing crops by reason of burying and removing the same. No well shall be drilled within 200 feet from any building now on said premises without the consent of the first party. Said land being of the following description, to-wit: (here follows description of the 81-1/2 acres).

"To have and to hold the above described premises, unto the said parties of the second part, their heirs and assigns, upon the following conditions: In case operations for either the drilling of a well for oil, gas or other minerals, is not commenced and prosecuted with due diligence within two years from this date, then this grant shall immediately become null and void as to both parties; provided that said second party may prevent such forfeiture from year to year by paying to the first party the sum of $10.00 per year, until such well is commenced or until shipments from such mine have begun, and it is agreed that the completion of a well shall operate as a full liquidation of all rental under this provision during the remainder of the term of this lease, which payments can be made at Bank of ———————— or payable direct to party of the first part. In case the parties of the second part should bore and discover either oil or other minerals, then in that event this grant, encumbrance or conveyance shall be in full force and effect for twenty-five years from the time of the dis-

covery of said product, and as much longer as oil, water, gas or other minerals can be produced in paying quantities thereon. Whenever sales are being made of the product produced on the land above described, a settlement thereof shall be made at the end of each quarter. This grant is not intended as a mere franchise, but is intended as a conveyance of the property above described for the purpose herein mentioned, and it is so understood by both parties to this agreement. It is understood between the parties to this agreement that all conditions between the parties hereunto shall extend to their heirs, executors, administrators and assigns. It is agreed and understood that there shall be no interference with my farming operations unless full remuneration shall be paid for such interference.

"Witness our hands this twenty-third day of February, 1901."

On July 31, 1901, Jno. C. Underwood conveyed to the Equitable Mining Company, Inc., all the right, title and interest which he acquired by virtue of the aforesaid instrument.

On January 15, 1902, the Equitable Mining Company released to W. F. Arnold and Kate Arnold its right, title and interest in 5 acres of said 81½ acres, said 5 acres being without the boundaries of the 76½ acres wherein lie the oil, gas and other minerals involved in this suit.

About October, 1902, the Equitable Mining Company conveyed to the Arnold Oil Company, Inc., one-third its right, title and interest in and to the oil, gas and other minerals in the 76½ acres.

Jno. C. Underwood, the Equitable Mining Company, and the Arnold Oil Company commenced and prosecuted with due diligence drilling operations for oil and gas on the 76½ acres until four wells had been drilled, within two years from February 23, 1901, to depths ranging from 500 to 1012 feet, at a total outlay of some $30,000. In the second well, begun in October, 1902, oil was discovered in paying quantities, and approximately 1000 barrels were marketed therefrom, W. F. Arnold receiving one-tenth royalty.

The last work of exploration or production, performed by Underwood or his assigns, on the 76½ acres, was in July, 1904, when the fourth well was finished.

After the completion of the fourth well in 1904, all drilling equipment and machinery were removed from the premises.

The drilling of the four wells exhausted every dollar available from either the Equitable Mining Company or the Arnold Oil Company. The drilling outfit was used in paying for the fourth well.

The manager for both companies was Jno. C. Underwood. The last attempt at development by Underwood or by any one claiming under him was narrated by Underwood as follows:

"For a great many years after we ceased operations there, I exerted myself to a considerable degree trying to raise additional money with which to make further development. During the life-time of

Governor Hogg, he divided my expenses where expenses were necessary in attempting such promotion, and, after his death, as occasion offered, at a small insignificant expense, I would attempt, at my own expense, to interest people with me. `I did not succeed, and eventually the burden of promoting this matter became more than my financial condition permitted, and I gradually dropped out.''

The Equitable Mining Company was incorporated March 30, 1901, with a capital stock of $50,000, for the purpose of establishing and maintaining oil companies, with authority to lease and purchase the right to prospect for, develop and use petroleum and other minerals and their products and to erect and own tanks, pipes and cars for the operation of its business. Governor Hogg was one of the company's principal stock-holders. Mr. A. J. Eilers of Austin was the company's president.

On July 1, 1905, the rights to do business in Texas of both the Equitable Mining Company and the Arnold Oil Company were forfeited on failure to pay franchise taxes.

President Eilers testified that the Equitable Mining Company ceased to do business or to hold meetings of directors or stockholders after entry of the forfeiture of its right to do business in 1905.

·Believing Arnold entitled to a release, Eilers signed, acknowledged and mailed to Arnold, at his request, an instrument, dated January 5, 1909, in the name of the Equitable Mining Company, acting by Eilers as President, under the corporate seal, whereby it was declared that the company had remised and released the $81\frac{1}{2}$ acres of land to Arnold, and whereby acknowledgment was made that the oil lease to Underwood had become null and void.

. Defendants in error are the successors or assigns of the Equitable Mining Company and of the Arnold Oil Company.

On December 26, 1908, W. F. Arnold and wife conveyed 70 of the $76\frac{1}{2}$ acres tract to A. McGary, for a cash consideration of $8750, the deed expressly conveying all the rights, both surface and mineral, in any wise pertaining to the 70 acres. By deeds dated respectively November 21, 1906, December 11, 1908, and August 26, 1917, the remainder of the $81\frac{1}{2}$ acres was conveyed by Arnold and wife to various persons, in different parcels. Whatever rights passed to the grantees in these last mentioned deeds, as well as to McGary under the deed to him, now belong to plaintiffs in error.

After the Equitable Mining Company and the Arnold Oil Company ceased their drilling operations, The West Columbia Oil Company in 1906 acquired what is called the ''Hogg lease''; and it drilled a well in 1907 west of the Arnold land, without finding any oil. The Palacios Oil Company succeeded the West Columbia Company, drilling six dry wells in 1908 or 1909, being in turn succeeded by the Markham Fuel Company, operating for a short period when it became insolvent. The Brazos Oil Company drilled on the Hogg land close

to Arnold's line in 1909, bringing in a well producing about 1000 barrels of low grade oil before it began to run salt water. It was about this time that A. McGary purchased the tract of 70 acres.

In 1913, several parties acquired leases on 1800 acres, near West Columbia, which were assigned to The Texas Company, whereupon that Company began drilling the first deep wells.

The Texas Company commenced a well on the 70 acres out of the $76\frac{1}{2}$ acres tract in 1918, and brought in a well, which proved the land richly productive of oil, in January, 1919, having expended approximately $150,000 prior to April, 1919.

On May 8, 1919, defendants in error instituted this suit for the recovery of $\frac{9}{10}$ the oil, gas and other minerals in the $76\frac{1}{2}$ acres of land.

The right of recovery by defendants in error is predicated on the view, adopted by a majority of the Court of Civil Appeals, that Underwood and his assigns acquired an absolute fee simple title to nine-tenths of the oil, gas and other minerals in place, upon condition subsequent that specified operations for drilling a well be performed, and that, after compliance with such condition subsequent, neither Arnold and wife nor their assigns could be reinvested with title to the oil, gas and other minerals, without a written conveyance, in the absence of limitation or estoppel.

Careful consideration leads us to disapprove the conclusion of the Court of Civil Appeals as to the legal effect of the grant to Underwood. The grant was of minerals in place with appurtenant rights. The vital consideration for the grant was royalties on mineral production. Arnold and wife could have made a deed of gift to their mineral estate. They could have conveyed the minerals for a nominal or formal consideration. Instead, they were careful to have the writing provide, in addition to the consideration of $1.00, a consideration of possibly large value, realizable only through exploration and production. The grant was plainly for the purpose of securing a test of the land, which, if successful was to result in the mining and marketing of valuable minerals, for the joint profit of grantors and grantee, their heirs or assigns. Testing was merely preliminary to production, which was the real aim and end of all parties. As if to remove doubt as to the true purpose of the grant, it was expressly declared: first, that it was the intent of all parties that the grant should operate as a conveyance *for the purpose mentioned;* and, second, that the parties understood such intent. The conveyance, for the purpose of exploration and production, and for no other purpose, was to continue for twenty-five years and as much longer as oil, gas or other minerals could be produced in paying quantities. The grant was to become null and void if operations for drilling a well for oil, gas or other minerals were not commenced within two years and prosecuted with

due diligence, provided the forfeiture might be prevented by a stipu-
lated yearly payment of money. The grant was not of an absolute
fee. The estate conveyed, on condition subsequent, was a determinable
fee, inasmuch as the land might always produce minerals in paying
quantities, causing the grant to endure forever, and inasmuch as the
intent is unquestionable that the land was to be used for no other
purpose than to drill for, and produce the minerals, and that the
grant was to be enjoyed only while the work of mineral exploration
and production was carried on. Stephens County v. Mid-Kansas Oil
Company, 113 Texas, 160, decided today, where authorities are col-
lated. Munsey v. Marnet Oil & Gas Co., 113 Texas, 212; Robinson v.
Jacobs, 113 Texas, 231.

The conveyance in Wilmore Coal Co. v. Brown, 147 Fed., 931, was
of minerals and incidental mining rights for ninety-nine years, with
privilege of renewal, in consideration of certain royalties, figured on
production, payable quarterly. Holding that after the expiration of
twenty-four years, during which the grantee did nothing to mine or
develop the minerals, he had no title thereto, the court said: "No
doubt, he took an estate in the minerals conveyed, but the grant was
for a definite purpose, the consideration to the original owners being,
not the paltry $5 or $10 recited in the deeds, whether paid or unpaid,
but the royalties which were to be derived as the result of mining.
The lessee was to make the minerals of value to them, which was the
whole inducement for parting with them, and that with due diligence,
an obligation which has been disregarded for nearly a generation.
The lessee's idea is that he can lie by indefinitely and yet retain the
rights granted, having 99 years, as it is said, in which to mine, with
the privilege of 99 more, and after that forever. Time is of no con-
sequence, according to the argument, and haste not contemplated;
developments being virtually left to his discretion, subject only to
liability in damages for unreasonable inaction. But this is not the
construction to be adopted. Judged by its purpose, the grant was not
absolute and unconditional, but qualified, and the neglect to exercise
the rights and privileges conveyed, for the period which appears here,
to the grave detriment of the grantors, is to be taken as a relinquish-
ment and abandonment of them, and that without regard to the acts
or intent of the grantee, short of actual assertive operation."

The New York Court of Appeals construed a lease of a tract of land
with the exclusive right to extract all oil therefrom "for the term of
twelve years from this date or as long as oil is found in paying quan-
tities," as conferring no right on the lessees, after their abandonment
within twelve years of the use of the premises for the purpose of ob-
taining the oil. The ground of the decision may be summed up in
three sentences as follows: "Undoubtedly the lessees had the right
of possession so long as they, in good faith, were engaged in boring
wells, or testing the oil-producing capacity of the land. But when it

was demonstrated that oil could not be obtained, or when they should abandon their search, their right to possess the property would end, and thereafter they would have no more right to occupy it than a stranger.  \*  \*  \*  The lessees having tested the premises to their satisfaction, and having for two years ceased .to use them for the purposes granted, it was well held by the learned referee that the contract might be and was legally terminated by the lessor.''  Eaton et al. v. Allegany Gas Co. Limited et al., 122 N. Y., 422, 25 N. E., 983.

A tract of land was leased for 99 years in consideration of the lessee's promise to pay one-tenth the gold or other metals procured from the land, which the lessee was authorized to mine.  In refusing to sustain the lessee's right to withhold the minerals from the lessor for 99 years, the Supreme Court of North Carolina said:  "It would be unjust and unreasonable, and contravene the nature and spirit of the lease to allow the lessee to continue to hold his term a considerable length of time, without making any effort at all to mine for gold or other metals.  Such a construction of the rights of the parties would enable him to prevent the lessor from getting his tolls under the express covenant to pay the same, and deprive him of all opportunity to work the mine himself, or permit others to do so.  The law does not tolerate such practical absurdity, nor will it permit the possibility of such injustice.''  Conrad v. Morehead, 89 N. C., 35, followed in Hawkins v. Pepper, 117 N. C., 415, 23 S. E., 434.

The Supreme Court of Illinois, while holding that gas and oil cannot be the subject of separate ownership in place, yet declares:  "The right to go upon the land and occupy it for the purpose of prospecting, if of unlimited duration, is a freehold interest, (Bruner v. Hicks, 230 Ill., 536, 82 N. E., 888) ;  but such interest, being vested for a specific purpose, becomes extinct when the purpose is accomplished or the work is abandoned.''  Watford Oil & Gas Co. v. Shipman, 233 Ill., 9, 122 Am. St., 144, 84 N. E. 54.

The question before us was involved in Texas & P. Ry. Co. v. Durrett, 57 Texas, 48, when it was determined what estate was created by a grant of a railroad right of way through certain premises and of a right to use wood, soil, gravel, and stone therefrom.  The habendum showed that whatever was granted was to be held forever ''for the uses and purposes aforesaid.''  The court held that the grant conveyed ''a qualified determinable fee, liable only to be divested if the estate is used for purposes other than that contemplated by the conveyance.''

In Judge Stayton's opinion in Texas & P. Ry. Co. v. Durrett, supra, the case of State v. Brown, 3 Dutcher, (27 N. J. Law) 13, is cited, wherein the Supreme Court of New Jersey said of a deed:  ''It conveys all the right, title and interest of the grantors in the land and its appurtenances for the term specified in the grant, towit:  'as long as used for said canal.'  By the terms of the conveyance, the grantees

take a qualified fee, liable to be defeated whenever they cease to use the land for the purpose specified in the grant. 1 Inst. 1 b 27 a; 1 Cruise 79 tit. 1, sec. 82; 2 Bl. Com. 110.''

The Court of Civil Appeals concluded that the wells drilled by Underwood's assigns liquidated all rentals and kept the grant in effect for twenty-five years. We think that the $10 per year payment clause had no relation to anything save prevention of a forfeiture from failure to drill with diligence, within two years from the date of the grant. After a well was drilled, with the required diligence, the grantee and his assigns were invested with title, freed of the express condition subsequent, to the oil, gas and other minerals, and incidental rights, for twenty-five years from the time of discovery of the oil, gas or other minerals, and as much longer as same might be produced from the 76½ acres of land in paying quantities. But, such title vested only for the purpose specified in the writing through which the title was derived. If it were true that the full purpose of the contract was to merely prove the 76½ acres to be oil bearing, there would be reason for saying that completion of a successful test vested indefeasible rights in the grantee or his assigns for twenty-five years or longer. But, to prove the land was no more than the first step towards the accomplishment of the true and ultimate purpose of all parties, viz.: the mutually profitable production of oil, gas or other valuable mineral. Grubb v. McAfee, 109 Texas, 531, 212 S. W., 464. The title and rights conveyed to Underwood or his assigns were to be held and used for no other purpose than mineral exploration, development, and production. When that purpose was no longer prosecuted by Underwood and his assigns, their title and estate instantly terminated.

The Supreme Court of Appeals of West Virginia decided a case very similar to this, styled Parish Fork Oil Co. v. Bridgewater Gas Co., reported in 51 W. Va., 583, 42 S. E. 655. 59 L. R. A., 566. There the term of the lease was fifteen years and as much longer as the premises were operated for oil. As here, the lease provided for the completion of one well within a comparatively brief time, or for the payment of a certain rental, and provided also: ''It is further agreed that when the first well is completed on said premises then all cash rentals shall cease.'' The lessees in that case contended that by completing the first well, producing oil in paying quantities, in accordance with the stipulation in the lease, they acquired an absolute vested title to the oil, of which they could not be divested save by reconveyance, etc. It was decided that on completion of the well the lessees did take title to the oil. But, in denying that the lessees could refuse performance of their obligations and continue to hold or own the oil, it is said, with irrefutable logic: ''There is no case which goes so far as to announce that after mere discovery of oil the lessee, upon the assumption of a vested interest or title, may cease operation, refuse to de-

velop the property, tie up the oil by his lease, and simply hold it for speculative purposes, or to await his own pleasure as to the time of development. A well-settled principle of law is that a contract shall be construed as a whole, and in the light of the purposes and objects for the accomplishment of which it was made. Oil leases are no exception to the rule, and, as the subject-matter of the lease is peculiar in its nature, the courts have given this principle great latitude in their construction. They are executed by the lessor in the hope and with an expressed or implied condition that the land shall be developed and oil produced. When production takes place, the lease is mutually beneficial. The royalty which it is stipulated in all these leases that the land-owner shall receive is generally the moving cause of the execution of the lease. . . . If a farm is leased for farming purposes, the lessee to deliver to the lessor a share of the crop in the nature of rent, it would be absurd to say, because there was no express engagement to farm, that the lessee was under no obligation to cultivate the land. An engagement to farm in a proper manner and to a reasonable extent is necessarily implied. The clear purpose of the parties to this lease was to have the lands developed, and the half-yearly payments and the other sums stipulated were intended not only to spur the operator, but to compensate Ray for the operator's delay or default. Ray v. Gas. Co., 138 Pa. 576, 20 Atl., 1065, 12 L. R. A., 290, 21 Am. St. Rep., 922. . . . All the provisions of the contract must be effective, if possible. By its terms this lease is to be in force for the period of 15 years from its date, and as much longer as the premises are operated for oil or gas. Another provision is that the lessor shall have one-eighth of the oil produced and $50 per annum for each gas well. It is just as important to the lessor that, when discovery of oil is made, the land shall yield him his royalty, as it is that discovery shall vest in the lessee title to the balance of the oil. If the lessee shall be permitted to sit down, and refuse to produce, after discovery, the lessor loses a part of what he contracted for. The contract bears no such constructions as that. What the lessee acquired by discovery is the right to produce and take the oil, paying out of it the stipulated royalty, and not title to the oil as it remains in the land, without production." To the same effect is the later case of Harris v. Michael, 70 W. Va., 356, 73 S. E., 937.

It is settled law in Pennsylvania that where lands are demised for a fixed term and as much longer as oil is found in paying quantities, with the exclusive right to conduct operations for the discovery and production of oil, thus passing title to the oil, such title is lost, even before the expiration of the fixed term, by failure to proceed with exploration and development, though the lease contains no express forfeiture clause, for the reason that the lessees "cannot hold the premises under their lease and not develop the territory." Highfield Co. v. Kirk, 248 Pa. St., 23, 9 Atl., 817; Ayr v. Philadelphia Co., 193

Pa. St. 456, 74 Am. St., 696, 44 Atl., 555; Barnsdall v. Bradford Gas Co., 225 Pa. St., 338, 26 L. R. A. (N. S.) 614, 74 Atl., 207; De Witt's Estate, 226 Pa. St., 550, 109 Atl., 699.

There are many cases holding that a failure to use proper diligence in the production of minerals, after discovery, is a breach of condition subsequent in the ordinary mineral lease, where the obligation to continue production is merely implied, for which breach the lease becomes subject to forfeiture. Benavides v. Hunt, 79 Tex., 395, 15 S. W., 396; J. M. Guffey Petroleum Co. v. Oliver, 79 S. W., 888; Fisher v. Cresent Oil Co., 178 S. W., 907; Hickernall v. Gregory, 224 S. W., 697; Petroleum Co. v. Coal, Coke & Mfg. Co., 89 Tenn., 381, 18 S. W., 66; Eastern Kentucky Mineral & T. Co. v. Swann-Day L. Co., 148 Ky., 82, 46 L. R. A. (N. S.) 672, 146 S. W., 441; Mansfield Gas Co. v. Parkhill, 114 Ark., 419, 169 S. W., 958; Price v. Black, 126 Ia., 304, 101 N. W., 1056; Loveland v. Longhenry, 145 Wis., 68, 140 Am. St., 1068, 129 N. W., 650; Gadbury v. Ohio & Ind. Consol. Nat. & Ill. Gas Co., 162 Ind., 9, 62 L. R. A., 899, 67 N. E., 259; Brewster v. Lanyon Zinc Co., 140 Fed., 811 to 814, 72 C. C. A., 213.

In Grubb v. McAfee, 109 Texas, 535, 212 S. W., 464, this court declined to hold that the implied obligation to continue the exploration for, and production of minerals, under a lease similar to that to Underwood, was a condition subsequent, for breach of which the lease might be forfeited. We see no necessity for changing the view on that point expressed in Grubb v. McAfee. However, there are expressions in that opinion as to the nature of the lessee's title and as to the plaintiff's suit being maintainable only on proof of abandonment, which are not consistent with our conclusions in this case and in the case of Stephens County v. Mid-Kansas Oil & Gas Company, supra. Much the same practical results are obtained whether the mineral estate conveyed is regarded as determinable or is regarded as held on condition subsequent, where there has been a failure of the lessee to perform the obligations, express or implied, which are essential to the accomplishment of the purpose of the grant. Our object is to announce a rule which is truly consonant with the real intent of the contracting parties.

We are convinced: first, that Underwood and his assigns took only a determinable fee under the grant from Arnold and wife, which terminated long ago, and, second, that abandonment of the purpose for which Underwood and his assigns were invested with their title and rights in and to the minerals and land was necessarily fatal to the maintenance of the suit of defendants in error. The evidence is undisputed, which conclusively shows that those under whom defendants in error claim entirely and permanently stopped and·abandoned the exploration and development of the 76½ acres and the production of minerals thereon. Their estate at once terminated without the need of a conveyance. All the oil, gas and other minerals remaining in the

land reverted to Arnold and wife or their assigns, and defendants in error had no title to support their suit.

Limitation has not barred the cross-action of plaintiffs in error to remove the cloud cast on their titles by the claim of defendants in error. Such claim seems to have arisen within four years next preceding the filing of the cross-action. Moreover, we prefer to follow the rule, which appears to be sustained by the weight of authority, that since the injury from a cloud on the title to real estate is continuing the cause of action for its removal is likewise continuing, and never barred while the cloud exists. Pannell v. Askew, 143 S. W., 365; Cooper v. Rhea, 82 Kan., 109, 107 Pac. 799, 29 L. R. A. (N. S.), 930, 136 Am. St., 100, 20 Ann. Cases, 42; Miner v. Beekman, 50 N. Y., 337, 17 R. C. L., sec. 71, p. 715.

The judgment of the Court of Civil Appeals is reversed and that of the District Court is affirmed.

Opinion delivered June 30, 1923.

### ON MOTION FOR REHEARING.

MR. JUSTICE GREENWOOD delivered the opinion of the court.

Defendants in error have filed a motion for rehearing and supporting arguments, which challenge the correctness of the conclusion that the "payment clause had no relation to anything save prevention of a forfeiture from failure to drill within two years from the date of the grant." It is earnestly insisted that our holding should have been that completion of a producing well, without anything more being done, continued the grant in force for the full term of twenty-five years.

Our conclusion is not accurately expressed in the quoted portion of the opinion, which was prepared under the stress of the closing days of last term. The provision for annual payments of ten dollars each was inserted in the lease, not to change the estate granted, but merely to enable the lessee to postpone drilling, after the expiration of two years. Without the clause, failure to commence drilling operations within two years, or to prosecute them, after being so begun, with due diligence, annulled the grant. With the clause, though no well had been commenced within the two years, the lessee might defer drilling for no longer than a reasonable time, on making the stipulated payments.

Since the payment of rentals authorized merely delay in drilling, the clause concerning it was no longer operative once a well was duly commenced and completed. Nothing could have been further from the minds of the parties, as disclosed by the entire writing, than that after the land was found to contain oil or gas, in paying quantities, it must remain wholly unproductive in the event the lessee elected to pay ten dollars per annum. Rorer Iron Co. v. Trout, 83 Va., 409.

The clause had two purposes essentially for the benefit of the lessee. The first purpose was to secure an option to make the small payments in lieu of development for a term beyond the two years. The second and perhaps the chief purpose was to make entirely clear that the lessee was not to be required to pay rentals after he had sunk a well and decided the enterprise could not be made profitable. The Law of Oil & Gas, Vol. 18 Michigan Law Review, pp. 655, 660; Parish Fork Oil Co. v. Bridgewater Gas Co., 51 W. Va., 583, 59 L. R. A. 571.

The clause was plainly not intended to defeat the dominant purpose of both contracting parties, which was the production of minerals for mutual profit.

The original opinion disposes of all other questions presented by the motion, which is overruled.

*Reversed and judgment of District Court affirmed.*

Opinion delivered October 31, 1923.