**WHELAN et al. v. SHELL OIL CO., Inc. et al.**

**No. 6343.**

Court of Civil Appeals of Texas. Texarkana.
March 4, 1948.

Dissenting opinion June 10, 1948.

Rehearing Denied June 10, 1948.

Taylor, Taylor & Taylor and Bibb & Green, all of Marshall, for appellants.

J. N. Saye and Henry H. Harbour, both of Longview, Barksdale Stevens, of Houston, and M. L. Walters, J. M. Singleton, and P. G. Henderson, Sr., all of Jefferson, for appellees.

WILLIAMS, Justice.

Angela and Mary J. Whelan on August 5, 1935, the owners in fee of four tracts of land including the 117-acre tract in controversy, all situated in Marion County, executed and delivered an oil and gas lease covering the four tracts to Shell Petroleum Corporation, now Shell Oil Company, Inc. The cash consideration paid for the lease was $12,206. The land was leased to the lessee "for the purpose and with the exclusive right of exploring, drilling, mining and operating for, producing, and owning oil, gas, sulphur and all other minerals and of laying pipe lines and of building tanks, * * * and other structures thereon to produce, save, treat and take care of said products."

The lease provides that it shall remain in force for a term of ten years (called

the Primary Term) and as long thereafter as either oil, gas, sulphur or any other mineral is produced from said land by lessee. A clause provides that, if operations for drilling a well or excavating a mine be not commenced on said land on or before the 5th day of August, 1936, it shall terminate as to both parties, unless on or before that date lessee shall pay lessors in the manner provided in the lease a delay rental of $625 which shall operate as a rental and cover the privileges of deferring commencement of operations for the drilling of a well or excavating of a mine for twelve months from said date. At the lessee's option, the lease may be thus continued, without drilling or mining operations, to the end of the primary term.

Paragraph 6 provides that "If on any rental date there be neither operations in progress for the drilling of a well or excavating a mine on said land, nor production therefrom, because of voluntary shutdown or for any reason, this lease shall terminate, unless lessee on or before said date shall make or resume the payment of rentals as herein set forth; provided if such operations be abandoned within a period of ninety (90) days prior to any rental date or if production ceases within such ninety (90) days' period, lessee shall have a period of ninety (90) days after such abandonment of operations or cessation of production within which to commence reworking operations or operations for the drilling of another well or excavating a mine or within which to make said rental payment, and the commencement of such operations or the payment of such rental within said ninety (90) days' period shall have the same force and effect as though commenced or paid on or before said rental date."

Section 7 provides that "if, at the expiration of the primary term of this lease neither oil, gas, sulphur nor other mineral is being produced on the leased premises, but lessee is then engaged in drilling for oil or gas or mining for sulphur or other minerals, then this lease shall continue in force so long as drilling or mining operations are being continuously prosecuted on the leased premises; * * * If oil, gas, sulphur or other minerals shall be discovered and produced from any such well or wells drilling or being drilled * * * at or after the expiration of the primary term of this lease, this lease shall continue in force so long as oil, gas, sulphur or other minerals shall be produced from the leased premises."

The lease granted to either party the right of assignment in whole or in part, and provided that: "Title to the minerals vested in lessee under this lease shall not end or revert to lessor until there is a complete, absolute and intentional abandonment by lessee of each and all of the purposes, expressed or implied, of this lease and every part and parcel of the premises described in this lease."

Shell drilled three producing wells on tract No. 1, the 117-acre tract. One well continued to produce oil therefrom in paying quantities until on or about December 13, 1944, at which time Shell deemed the wells non-commercial and plugged and abandoned all three wells. And by January 22, 1945, the tanks, derricks, all oil-well supplies, equipment, and pipe lines owned and used by Shell on the 117-acre tract had been dismantled and removed from the premises and the only employee of Shell in Marion County had been relieved of his duties regarding the tract and transferred to Louisiana. On January 15, 1945, L. M. Holder, the agent and production superintendent in charge of operations on the lease involved, and who was charged with the duty of making production reports, made a report covering this and another lease showing amount of oil produced from leases for December, 1944. This report made under oath and filed with the Railroad Commission of Texas, contained under a heading, "Remarks: Final Report for Jefferson, as these leases are abandoned." No delay rental was tendered or paid to plaintiffs by Shell or its successors or assigns, for the year beginning August 5, 1944.

Shell executed a formal release in the fall of 1944, to the lease covering tracts 2, 3, and 4, described in the original lease, but not on No. 1, the 117-acre tract. In response to a request made by the Whelans

in January, 1945, for a release of the lease on this 117 acres, Shell on February 2, 1945, advised plaintiffs by letter that "We shall be glad to furnish you a release on the balance of the acreage, we are holding (Tract No. 1) after August 4, 1945, at which time the primary term expires."

In February, 1945, Shell and Jefferson Oil and Gasoline Company began negotiations with each other, which resulted in an agreement in March, 1945, as to the terms of a "farm out" contract which was reduced to writing on May 15, 1945. In the early part of July, 1945, the Jefferson Company began operations for the drilling of another well by commencing the building of a road to a new location on the 117-acre tract. Crow Drilling Company under a contract with Jefferson began actual drilling of said well on July 30, 1945, and continuously drilled the well until it was completed as a commercial oil well in September, 1945. The well has produced oil continuously since September, 1945.

The court further found that neither Shell nor its assignees used the 117-acre tract from December 13, 1944, to July 1, 1945, for the "exploring, drilling, mining and operating for production of oil and gas save and except the negotiations between said Shell and the Jefferson Oil Company relative to drilling the lease to a deeper depth for the production of oil and gas"; and further that neither Shell nor any of its assignees occupied or used the 117 acres for any purposes whatsoever from January 22, 1945, to July 1, 1945, except that they did use it for trading purposes endeavoring to secure some one to explore for deeper oil.

Grounded upon above enumerated findings of fact of the trial court, which are without dispute, Angela Whelan and the heirs of Mary J. Whelan, plaintiffs below, who appeal from a take-nothing judgment, assert that when Shell Oil Company, Inc., completely ceased to use the 117-acre tract for the purposes of "exploring, drilling, mining and operating for, producing and owning" the minerals under said tract, on January 22, 1945, that the estate of Shell Oil Company instantly terminated and reverted to plaintiffs. Their prayer being for the court to find and declare the lease terminated as of "on or about January 22, 1945." Shell and its assigns together with Crow, who holds an assigned interest in the present production for services rendered in drilling the well, and P. A. Prewitt who intervened, are appellees.

In support of their theory here advanced, appellant cites Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27, wherein it is reannounced that a determinable fee as here involved can be lost "on cessation of the use of the land for purposes of oil and gas exploration, development, and production," and that such an estate of the lessee does not survive abandonment, citing authorities 19 S.W.2d on page 29. Above rule would be pertinent here if we were dealing with the failure or cessation of the lessee's implied obligation to continue development operations or the production of oil after the expiration of a primary term, or if the clauses construed in above authorities were similar to the provisions of the "unless" lease here involved.

■ The lease was in full force and effect on August 5, 1944, its ninth anniversary. If lessee had on or prior to this date paid $625, the amount specified as delayed rentals, it is without cavil that such payment would have extended the life of the lease for at least an additional 12 months' period, or until August 5, 1945. No delayed rentals was then due to be paid by the lessee for on this date the latter was producing oil in commercial quantities. This production of oil in lieu of the payment of such delayed rental likewise legally operated to extend the life of the lease until August 5, 1945. If lessee had never begun operations for the drilling for oil but had timely paid all delayed rentals the lease provisions would have extended the life of the lease to the end of the primary term. Lessee was not obligated to drill or begin operations to drill to reap the benefit of such extended period (a drainage question or a negligent operation of a well is not here involved). We are unable to see how any different rule or a greater duty would rest upon this lessee to secure the benefit of such an extension where as

here production is exhausted between two anniversary dates. It is our conclusion that all the right granted the lessee in the lease remained in full force for this additional period of twelve months.

Unquestionably, Shell abandoned the wells on the lease on or about January 22, 1945, and after production had ceased, used the tract only for trading purposes to secure some one to explore for oil at a deeper depth. The record also reflects that Shell was watching the result of drilling operations in the area but does not disclose an intent on Shell's part to further develop this tract at is own expense. Notwithstanding, it is our conclusion that such facts and circumstances did not vitiate Shell's rights under the lease for the additional twelve months from August 5, 1944.

To constitute abandonment by the lessee * * * there must be both an intention to abandon and an actual relinquishment of the enterprise. Jacobs v. Robinson, Tex. Civ.App., 241 S.W. 241, 243; Clutter v. Wisconsin Texas Oil Co., Tex.Civ.App., 233 S.W. 322, 323, 326; 31-A T.J. (Oil and Gas) Sec. 168. The acts of Shell in negotiating for the drilling of a well to a deeper depth and to begin such negotiations in February, 1945, following the removal of the equipment in the latter part of January with the successful results obtained is incompatible with an intent to relinquish all rights then invested in lessee under the terms of the lease. Lessee's refusal to grant appellant's request for a release in February does not comport with an intent to relinquish the rights that then existed under the lease. Such a cessation of use as here involved under all the facts and circumstances did not as a matter of law constitute an abandonment of lessee's rights under the lease contract. Summers' Oil & Gas, Sec. 459, pp. 80, 81, 82.

The producing well on the tract at time of trial as the result of drilling operations begun prior to and being conducted on August 5, 1945, the expiration date of the primary term, and continuously prosecuted under the provisions of Sec. 7, of the lease above set out sustains the legal conclusion, as found by the trial court, that the lease continued to be a valid and subsisting lease.

The judgment is affirmed.

HALL, Chief Justice (dissenting).

The dissent heretofore filed is withdrawn and the following substituted therefor:

I am unable to agree with the conclusions reached in this case by my associates. The case is fully and fairly stated in the opinion by Justice Williams concurred in by Justice Harvey.

The primary purpose and objective of the parties in executing the lease in question was the production of oil for their mutual profit, the extent of their respective benefit being measured by the extent of their interest in the oil produced or its value. 31-A Texas Jurisprudence, Sec. 63, p. 112; Texas Co. v. Davis, 113 Tex. 321, 331, 254 S.W. 304, on rehearing, 255 S.W. 601; Stephens County v. Mid-Kansas Oil & Gas Co., 113 Tex. 160, 254 S.W. 290, 29 A.L.R. 566; Cheek v. Metzer, 116 Tex. 356, 291 S.W. 860. The lease specifically provided that it was: " * * * for the purpose and with the exclusive right of exploring, drilling, mining, and operating for and producing and owning oil, gas, sulphur and all other minerals and of laying pipe lines and of building tanks, telephone lines, power stations and other structures thereon to produce, save, treat, and take care of said products and housing its employees."

It was through this provision that Shell Oil Company acquired its title. That title vested at the time of the execution of the lease and only for the purposes set forth in the lease. Thus the estate created and acquired by Shell was a qualified or determinable fee for the reason that after production was obtained, such production might continue forever, and for the further reason that there were various contingencies in the express terms of the lease, any of which, if it should happen, would determine the estate, but if none of them should happen, the estate might continue forever. Specifically, cessation of the use of the premises for the purposes enumerated was operative as a special limitation

upon the estate so created and acquired by Shell, unless contracted against by the parties. This, the parties could have done but did not do so except in a special and limited way. These contractual provisions are found in paragraphs 5 and 6 of the lease.

It is sufficient to say here that these provisions are in no way applicable or pertinent to a determination of any of the rights of the parties herein for the simple reason that neither of them were complied with by Shell. The trial court, as well as this court, found that neither appellee nor any of its assignees, within contemplation of the purpose clause of the lease, used or occupied the premises from January 22, 1945, until July 1, 1945, a period of more than five months, and that no delay rentals were paid, as provided for in the lease.

Therefore, by reason of the very nature of the estate granted, absent any contractual provisions relieving the lessee against this special limitation when Shell ceased to use the premises for the purposes of prospecting for and producing oil, as they admittedly did, according to the finding of the trial court and the undisputed evidence, this special limitation became operative and the estate granted ipso facto determined and reverted to the Whelans, and this even though the cessation of use occurred within the primary or exploratory term of the lease. In the view of the writer, this is the settled law of Texas. Stephens County v. Mid-Kansas Oil & Gas Co., supra; Texas Co. v. Davis, supra; Munsey v. Marnet Oil & Gas Co., 113 Tex. 212, 220, 254 S.W. 311; Robinson v. Jacobs, 113 Tex. 231, 239, 254 S.W. 309; Thomason v. Ham, 113 Tex. 239, 246, 254 S.W. 316; Woods v. Bost, Tex.Civ.App., 26 S.W.2d 299; 7 Tex.L.Rev. 502; 3 Summers, Law of Oil and Gas, p. 78; Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27, 29; Cosden Oil Co. v. Scarborough, 5 Cir., 55 F.2d 634; Stanolind Oil & Gas Co. v. Barnhill, Tex. Civ.App., 107 S.W.2d 746; Mon-Tex Corporation v. Poteet, 118 Tex. 546, 19 S.W. 2d 32.

First, the doctrine of "cessation of use" is a special limitation, which instantly severs the lessor-lessee relationship; it cannot constitute a covenant, since the relationship has ended. Secondly, no less eminent authority than Professor A. W. Walker, in his valuable article, "The Nature of the Property Interest Created by an Oil and Gas Lease in Texas," 8 Tex.L.Rev. p. 509, correctly states: "It (cessation of use) cannot possibly have any importance after the expiration of the exploratory term for the continuance of the estate then depends upon the continued production of oil and gas. So long as the premises produce oil or gas, the estate will endure, and as soon as it ceases to do so, the estate terminates by its own terms." Lastly, the conclusion of the majority that the "unless" form of the lease is controlling, is contrary to the holding in the Stephens County case, supra, wherein it is held that the various forms of oil and gas leases do not alter the nature of the estate created. Justice Greenwood said [113 Tex. 160, 254 S. W. 294]: "Why hold that instruments in different forms create different estates, where there is no difference in fact with respect to that of which each divests the grantor, his heirs or assigns, nor with respect to that with which each invests the grantee, his heirs or assigns?" In Texas Co. v. Davis, supra, on rehearing, the court held that the delay rental clause "was plainly not intended to defeat the dominant purpose of both contracting parties, which was the production of minerals for mutual profit."

It is not thought that the majority, in holding that the production of oil on August 5, 1944, the ninth and final rental-paying date, in lieu of the payment of delay rentals legally operated to extend the life of the lease until August 5, 1945, intended to construe the lease as a whole, but that such conclusion is based upon an implication from paragraph 6 alone. The intention of the parties is expressed in clear and unambiguous language in the granting clause. In such circumstances, rules of construction may not be resorted to in order to arrive at the intention of the parties. 31-A Tex.Jur., Sec. 109, p. 180; Magnolia Petroleum Co. v. Connellee, Tex.Com.App., 11 S.W.2d 158, and authorities cited therein. The implication made

**996**

by the majority, in effect, amounts to a deletion of the purposes expressed by the parties in the granting clause, and that, in addition, an insertion of the following provision has been made: "If lessee is producing oil on August 5, 1944, the last rental date, such production shall be in lieu of the payment of rentals, and shall serve to extend the lease for a period of 12 months."

Courts are powerless to change solemn and binding agreements of parties in the process of determining what rights the parties have under such instruments. And, in view of the clear expression of the intention of the parties to the lease here in question, the following rule is controlling: "A court, in any event, may only imply a provision in a contract in order to arrive at and enforce the true intent of the parties; it cannot ever deduce a term in flagrant defiance of an intent clearly expressed. There is here no room for interpolating into the arrangement, by construction, a term not there, and whose existence there is expressly negatived."

Joseph v. Bostick, Tex.Com.App., 1925, 276 S.W. 672, 676; 12 Am.Jur., Contracts, Sec. 228. The holding of the majority, therefore, modifies, if it does not entirely change, the granting clause of the lease wherein the parties expressed the intention that the premises were to be used for specified purposes, and also alters the determinable fee character of the estate created therein.

In the last analysis, the provision implied by the majority, and upon which the decision is based, abrogates the intention which the parties themselves expressed in the granting clause, and substitutes therefor an intention that the production of oil on August 5, 1944, dispensed with any further use of the land for the tenth and final year of the lease. This is contrary to the rule announced in Texas Farm Bureau Cotton Ass'n v. Stovall, 113 Tex. 273, 253 S.W. 1101, by Chief Justice Cureton: "The primary test of the character of a contract is the parties' intention as manifested by its terms." The court, in construing any written instrument, cannot alter the instrument. 3 Williston on Contracts, Rev.

Ed. 1936, Sec. 620, pp. 1786, 1788. This was succinctly said by this Court in Shell Oil Co. v. Goodroe, Tex.Civ.App., 197 S. W.2d 395, 399: "* * * it is not our duty to make contracts for the parties nor to determine the wisdom of their undertaking expressed in the contract, but to construe the contract the parties have made."

In view of what has been said, it becomes unnecessary to discuss the question of abandonment, or the holding of the majority thereon.

I think that the case should be reversed and judgment rendered for appellants.