Robert Ashton HILL et al., Appellants,

v.

Davis Ashton ROBINSON et al., Appellees.

No. 1202.

Court of Civil Appeals of Texas, Tyler.

Nov. 29, 1979.

Rehearing Denied Jan. 3, 1980.

Ray A. Bass, III, Robert B. Wallis, Haynes & Fullenweider, Richard K. Loesby, Charles F. Browning, Orsburn & Browning, R. Mayo Davidson, Houston, for appellants.

W. Robert Brown, George W. Tenney, Liddell, Sapp, Zivley & Brown, R. Michael DeGuerin, Foreman & DeGuerin, Houston, for appellees.

1. Mother of the deceased.

2. Wife of the deceased.

3. Son of the deceased by a prior marriage to Joan Robinson Hill, deceased.

MOORE, Justice.

This is a suit brought under the Wrongful Death Statute seeking damages for the murder of Dr. John R. Hill. Appellants, Myra Hill,[1] individually and as executrix of the estate of Dr. John R. Hill, deceased; and Connie Hill,[2] individually and as guardian of Robert Hill,[3] instituted suit against appellees, Davis Ashton Robinson, Lilla Paulus, and Marsha McKittrick, alleging that Dr. Hill was killed as a result of a murder-for-hire conspiracy perpetrated by the appellees. Appellants alleged that Dr. John R. Hill was the victim of a heinous murder-for-hire conspiracy undertaken by the named appellees herein and other unknown co-conspirators. They alleged that appellee, Ash Robinson, who was the former father-in-law of Dr. John R. Hill, secretly met with appellee Lilla Paulus and made a contract for the murder of Dr. Hill. Under this contract, appellee Ash Robinson is alleged to have paid $25,000.00 to appellee Lilla Paulus. Appellants alleged that in return appellee Lilla Paulus agreed to and eventually did contact and hire Bobby Wayne Vandiver, and was assisted in her efforts to hire Vandiver by appellee Marsha McKittrick. Appellants alleged that Paulus paid $5,000.00 to Vandiver, and thereafter, on September 24, 1972, Dr. Hill was shot and killed in his home by Vandiver.[4] Appellants further alleged that the conspiracy to murder Dr. Hill was instigated by appellee Ash Robinson, who acted out of revenge and hatred for the deceased, Dr. Hill, and that Robinson's hatred and act of revenge stemmed from the earlier death of his daughter, Joan Robinson Hill, who was the first wife of the deceased. Appellees Ash Robinson and Lilla Paulus answered, denying generally the allegations of the petition. Appellee Marsha McKittrick failed to answer, and an interlocutory default judgment was entered against her.

4. Vandiver was subsequently slain by a police officer and hence was not made a party to this suit.

The case was submitted to the jury upon special issues. Under Special Issue No. 1 the jury was requested to find whether a conspiracy existed between two or more persons, the purpose of which was to take the life of Dr. John R. Hill. In response to the special issue the jury answered: "We do not." Pursuant to the jury's finding, the trial court entered a take-nothing judgment against appellants, from which judgment they perfected this appeal. For convenience the parties will sometimes be hereinafter referred to only by their last name.

We affirm.

Dr. John R. Hill, deceased, was originally married to Joan Robinson Hill, daughter of appellee Ash Robinson. Born of the marriage was one son, appellant Robert Ashton Hill. In 1969, Joan Hill became ill with a rather unusual type of illness. She was treated by her husband, Dr. Hill, and subsequently died. Shortly thereafter, Dr. Hill married Ann Kurth. Ash Robinson accused Dr. Hill of having murdered his daughter by placing a poisonous substance in her food. Much bitterness and animosity developed between Robinson and his former son-in-law, Dr. Hill. In 1970, Dr. Hill was indicted and tried for the murder of his former wife, Joan Hill. The case resulted in a mistrial and at the time of Dr. Hill's death the murder charge was still pending against him.

After divorcing Ann Kurth, Dr. Hill married appellant, Connie Hill, on June 17, 1971. They resided in Dr. Hill's home in Houston, Texas, along with Dr. Hill's minor son, Robert Hill. Appellee, Ash Robinson, maintained his residence in Houston as did appellee Lilla Paulus. Robinson had known Paulus for several years, having become acquainted with her at horse shows and riding stables attended by Joan Robinson and the daughter of Mrs. Paulus. As a result, Paulus learned of Robinson's hatred and bitterness toward Dr. Hill.

In January, 1972, Paulus met appellee Marsha McKittrick, a prostitute, who thereafter occasionally lived in the Paulus home. Paulus sometimes supplied McKittrick with clients. Thereafter, McKittrick met Bobby Vandiver, an ex-convict, and introduced him to Paulus. Vandiver occasionally lived with McKittrick in the Paulus home. During this period, Ash Robinson visited in the Paulus home where he met Marsha McKittrick.

On September 24, 1972, the day Dr. Hill was murdered, Myra Hill was staying at the Hill home, caring for Robert Hill while Dr. Hill and Connie Hill were attending a medical convention in Las Vegas, Nevada. At about 7:00 p. m. that evening, McKittrick drove Vandiver from the Paulus home to the Hill home. Vandiver went to the front door and forced his way in at gunpoint. He forced Myra Hill and Robert Hill into the dining room area where they were bound and gagged. Vandiver knew that Dr. Hill and Connie Hill were scheduled to arrive from Las Vegas shortly thereafter. He had been informed by Paulus that Dr. Hill would be carrying a large sum of money. When Dr. Hill and his wife came in the front door, Vandiver announced that it was a robbery and immediately seized the collar of Connie Hill's dress. A violent struggle ensued, and Vandiver finally shot and killed Dr. Hill. He took the doctor's wallet and briefcase and fled. He later contacted McKittrick as planned, and they both drove back to the Paulus home. They immediately left for California.

Later, both Paulus and McKittrick were convicted for the murder of Dr. Hill. At that time, Vandiver, although having made bond, was a fugitive. After his arrest, he was offered certain amenities provided he would cooperate. He then made a confession implicating Robinson, Paulus, and McKittrick as co-conspirators. After being released from jail, he was shot and killed by a policeman in Longview, Texas.

When the present suit came to trial, Paulus refused to testify, relying on the rights granted her under the Fifth Amendment of the United States Constitution. Consequently, in order to establish their allegations of a conspiracy, appellants were compelled to rely upon the testimony of appellee, Marsha McKittrick. After being called as a witness by appellants, McKittrick testi-

fied that she was present in the Paulus home when Paulus hired Vandiver to murder Dr. Hill for the sum of $5,000.00. She testified that Paulus later told her that Ash Robinson was paying to have Dr. Hill killed. According to her testimony, she had seen Ash Robinson in the Paulus home on three different occasions and had heard him say that he did not believe justice would be done until Dr. Hill was dead. After Paulus had hired Vandiver, McKittrick testified that she was with Paulus on several occasions when Paulus met with Ash Robinson in his automobile at various parking lots in Houston. She testified that on one occasion she saw Robinson pass Paulus what appeared to be a dark roll, which was about one and one-half inches long and one and one-quarter inches in diameter. On one occasion while Robinson was in the Paulus home, McKittrick testified that she overheard him tell Paulus that he was paying her in "unrecorded" bills that could not be traced. She testified that on the morning of the murder, she overheard Robinson tell Paulus that Dr. Hill would return from Las Vegas that night carrying a large sum of money and heard Robinson say that "it should be taken care of before Hill went back to trial." She admitted, however, that she never heard Robinson discuss the murder of Dr. Hill. She testified that after the murder Paulus gave Vandiver the $5,000.00 and told her that she had gotten it from Ash Robinson.

While testifying in his own behalf, Ash Robinson admitted that for a year and a half after the death of his daughter Joan, he was extremely vindictive toward Dr. Hill and continued to believe that he was responsible for her death. He denied, however, that he wanted Dr. Hill killed. Although he admitted that he had been in the home of Lilla Paulus on one occasion, he denied that he had ever given her any money or discussed the murder of Dr. Hill. He denied that he had ever met or talked to Vandiver, and there is nothing in the record to the contrary. In short, Robinson emphatically denied that he had anything whatsoever to do with the murder of Dr. Hill.

It is obvious from the record that the major thrust of the defense was to show that the death of Dr. Hill was the result of an armed robbery rather than the work of a hired killer. In an effort to prove the point, the defense called Howard Douglas Sullins, who testified that he had known McKittrick for some time, and that he had seen her in the summer of 1973 shortly after her release from prison, at which time she told him that the Hill murder was nothing but a "robbery gone sour."

Inasmuch as appellants do not attack any of the jury's findings, we will not burden this opinion with a further discussion of the evidence.

Under their first point of error, appellants urge that the trial court erred in refusing to admit into evidence the confession of Bobby Vandiver, deceased, because the confession, they say, was relevant and admissible as a declaration against interest and therefore was admissible as an exception to the hearsay rule.[5]

In his confession, Vandiver recounted the incident herein described above. He confessed to armed robbery, aggravated assault, conspiracy, illegal possession of a weapon, interstate flight to avoid prosecution, and the murder of Dr. Hill. He implicated Marsha McKittrick as a co-conspirator and as an accomplice. He also implicated Lilla Paulus, stating that she employed him and paid him for the murder of Dr. Hill. Although the confession did not mention appellee Ash Robinson by name, the confession tends to implicate him as shown as follows:

"She [Paulus] gave me the details over a period of about two days. She told me that the contract was on a doctor that had killed his wife. And that it was the wife's father that was wanting him dead . . . She kept referring to the man wanting Dr. Hill dead as MY MAN or the OLD MAN."

5. Vandiver's confession dated April 13, 1973, is before us by way of a bill of exception.

Appellants concede that there is ample evidence in the record without the confession to show that Vandiver pulled the trigger on the gun that killed Dr. Hill. They argue, however, that the confession was relevant upon the disputed issue of whether Vandiver was a hired killer or whether he killed Dr. Hill in the course of an ordinary robbery. In response appellees state that since it is undisputed that Vandiver committed the murder, appellants' only purpose in offering the confession was to establish a conspiracy. They argue that the portion of the confession which states that there was a conspiracy is not a declaration against Vandiver's interest, and therefore the statement was properly excluded.

■ One of the oldest exceptions to the hearsay rule is declarations against interest. A declaration against interest is defined as a statement opposed to a pecuniary or property interest of the declarant. 2 C. McCormick & R. Ray, Texas Law of Evidence sec. 1001 (Texas Practice 2d ed. 1956). The requirements necessary to establish this exception to the hearsay rule are authoritatively set forth by our supreme court in Duncan v. Smith, 393 S.W.2d 798 (Tex. 1965). The court stated that:

" 'Declarations made by a deceased person as to facts presumably within his knowledge, if relevant to the matter of inquiry, are admissible in testimony as between third parties: First, when it appears that declarant is dead; second, that the declaration was against his pecuniary interest; third, that it was a fact with respect to a matter of which he was personally cognizant; fourth, that declarant had no possible motive to falsify the fact declared.' "

Duncan v. Smith, supra, at 803, quoting 31A C.J.S. Evidence § 218, at 606 n. 11 (1964). The court goes on to qualify the fourth requirement:

" 'It is sometimes stated as an additional requirement of this exception that the declarant must have had no motive to misrepresent. But this is not the accepted way of actually disposing of the situation where along with the disserving interest there is a self-serving interest. The real problem involved is: Should the two opposing interests be weighed and the statement received only if it is found that the disserving interest had the greater probable influence? . . . Most courts have taken (this) alternative.' "

Duncan v. Smith, supra, quoting 2 C. McCormick & R. Ray, Texas Law of Evidence sec. 1007 (Texas Practice 2d ed. 1956).

According to the weight of authority, before a declaration against interest may be admitted into evidence, the statement must have been against the pecuniary or proprietary interest of the declarant and not merely such as would subject him to criminal action or civil suit. 29 Am.Jur.2d Evidence sec. 619, at 673 (1967). Extrajudicial declarations of the commission of criminal acts have been held, in most jurisdictions and in both criminal and civil cases, not admissible into evidence as declarations against interest. Annot., 162 A.L.R. 446 (1946); 29 Am. Jur.2d Evidence sec. 620 (1967); see 2 C. McCormick & R. Ray, Texas Law of Evidence sec. 1005 (Texas Practice 2d ed. 1956); 5 Wigmore, Evidence sec. 1476 (Chadbourn rev. 1974). The Texas Court of Criminal Appeals has recently recognized the foregoing rule as a sound and rational rule except in certain kinds of criminal cases that do not apply here. Ramirez v. State, 543 S.W.2d 631, 632–33 (Tex.Cr.App.1976).

The primary reason for not giving declarations against penal interest the same weight as those against pecuniary interest is discussed by the Supreme Court in Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1972). In that case the court pointed out that the admission of declarations against penal interests would lead to frequent presentation of perjured testimony, because confessions of criminal activity are often motivated by extraneous considerations, and therefore are not as inherently reliable as declarations against pecuniary interests. Chambers v. Mississippi, supra, at 299–300, 93 S.Ct. 1048.

■ The court went on to hold that under some circumstances, the right of a crim-

inal accused to present a third party confession which would exonerate him might be required on constitutional due process grounds, in spite of a state's policy of not admitting declarations against penal interest. The Texas rule, of course, admits declarations against penal interest in criminal cases where the declaration would exonerate the accused and certain other conditions of strong need are demonstrated. *Ramirez v. State,* supra.

 Appellants recognize that the majority of the courts exclude declarations against penal interest and urge us to follow the increasing number of jurisdictions in which such declarations have been held admissible. See 29 Am.Jur.2d *Evidence* sec. 620, at 674 (1967). While we have found no civil case in this state that definitely holds that a declaration against penal interest is inadmissible, we find no compelling reason to depart from the majority rule. Accordingly, we hold that the confession was properly excluded. Appellants' first point is overruled.

 Even if we were inclined to follow the minority rule, under the facts of this case we do not believe that the action of the trial court in refusing to admit the confession into evidence would present error. Under both the majority and minority rule the requirement of trustworthiness is a common thread running through all the cases involving this exception to the hearsay rule. In order to be admissible, the declaration, whether it be against pecuniary, proprietary, or penal interest, must possess some indicia of reliability. See *Chambers v. Mississippi,* supra, at 298–301, 93 S.Ct. 1047–48. The record shows that at the time Vandiver gave the statement, he was in police custody, facing a "habitual criminal" indictment which could have resulted in his receiving an automatic life sentence. He was offered a lesser term if he "cooperated." In addition to this he was offered an otherwise unavailable release on bond. After he was released from jail he was given living expenses by the State.

Before a declaration against interest will be admitted into evidence, it must be shown

that it was improbable that there was a motive to falsify. *Chambers v. Mississippi,* supra; *Duncan v. Smith,* supra. Under the circumstances existing here, a serious question arises as to whether Vandiver was voluntarily telling the truth or whether he was attempting to shift the onus of conceiving and masterminding the crime to Ash Robinson and Lilla Paulus. Also, in view of the amenity of the State, a serious question arises as to whether he was attempting to satisfy the prosecutors who were no doubt eager to tie other parties to the crime. Thus, the question arose as to whether the confession possessed the necessary indicia of reliability authorizing its admission in evidence. Under these circumstances, the question of whether the confession was admissible in evidence was a matter lying within the sound discretion of the trial court. *Phagan v. State,* 509 S.W.2d 703, 707 (Tex.Civ.App.—Fort Worth 1974), cert. denied, 421 U.S. 995, 95 S.Ct. 2391, 44 L.Ed.2d 663 (1975). In our view no abuse of discretion was shown. Thus, even if the minority rule were applicable, the action of the court in excluding the confession would not present error.

 By their second point, appellants assert that the trial court erred in instructing the jury upon the definition of a conspiracy, because the net effect of the instruction allegedly required appellants to prevail on the same disputed fact issue three times. We find no merit in this point, and it is accordingly overruled.

In this connection, the trial court instructed the jury as follows:

"You are instructed that a conspiracy is defined as a combination of two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. You are further instructed that in order to find a conspiracy, you must find from a preponderance of the evidence each and every one of the following: (1) there was a combination of two or more persons, (2) there was an agreement or meeting of the minds among those persons, (3) on a common

purpose, (4) that each of those persons had knowledge of the purpose, (5) that each of those persons intended to participate therein, and (6) one or more overt acts done in pursuance of the conspiracy."

Appellants argue that the instruction contained in item one, wherein the court instructed the jury that there must be a "combination" between two or more persons, was tantamount to instructing the jury that they were required to find the existence of an agreement, and that by again instructing the jury in item two that there must have been an "agreement," the court required appellants to prove the same thing twice. In addition to this, they state that item five also had the effect of instructing the jury for the third time that appellants were required to prove the existence of an agreement. They state in their brief that their main complaint with the court's instructions is that it greatly increases the burden of proof.

The six elements listed by the court as being necessary to establish a civil conspiracy are practically the same as those listed by the court in *Maxey v. Rodman*, 444 S.W.2d 353 (Tex.Civ.App.—El Paso 1969, writ ref'd n. r. e.). The six-item list adopted by the court in that case constitutes a summary of the general discussion of the elements of conspiracy contained in *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corporation*, 435 S.W.2d 854 (Tex.1968).

Under Rule 277 of the Texas Rules of Civil Procedure, the trial court has considerable discretion in deciding what instructions are necessary and proper in submitting issues to the jury; additionally, the trial court may make an incidental comment on the weight of the evidence where such comment is properly a part of the explanatory instruction or definition. *Spradling v. Williams*, 553 S.W.2d 143, 145 (Tex.Civ.App.—Beaumont 1977), affirmed 566 S.W.2d 561 (Tex.1978). We reject the notion that items one and five had the effect of repeatedly advising the jury that a finding of an agreement was required. The purpose of item one was to advise the jury that there

must be two or more persons involved in the combination, and the purpose of item five was to advise the jury that there must have been an intent to participate. Appellants do not contend that they did not have the burden of proving an agreement among the alleged conspirators. Even if items one and five had the effect of inferentially advising the jury that they were required to find the existence of an agreement between two or more persons, we fail to see how it could be said that the error, if any, was calculated to cause and probably did cause the rendition of an improper judgment. Tex.R.Civ.P. 434.

Appellants further contend that it was error for the trial court to refuse, upon appellants' motion, to charge the jury on the law as set forth in Rule 287.

Rule 287 provides, in part:

"If the jury disagree as to the statement of any witness, they may upon applying to the court, have read to them from the court reporter's notes that part of such witness' testimony on the point in dispute . . . ."

The record reveals that on the second day of deliberations, the jury, in writing, requested the testimony of Marsha McKittrick, Fred Bolton, and Connie, Myra, and Robert Hill. Appellants immediately made a motion that the jury be instructed in accordance with Rule 287 quoted above. The court overruled the motion and inquired of the jury as to whether there was a disagreement among the jurors as to the statement of a witness. The jury answered in the affirmative, and the court then replied asking the jury "Who is the witness? What is the point in dispute?" The jury replied: "(1) Myra, Connie & Robert Hill. Their testimony about the events that evening in the Hill home immediately preceeding (sic) the killing of Dr. John Hill concerning Bobby Vandiver. (2) Marsha McKittrick. Her testimony about the events leading up to & the night of the murder of Dr. Hill." The court again sent the jury a note asking "Who is the witness? What is the point in dispute?" The foreman of the jury then answered: "Judge, I

answered those questions previously. I do not understand," to which the court replied: "I do not believe you have." Shortly thereafter, the jury recessed until the next morning. The jury made no further communications with the court during their deliberations.

The rule provides that "if the jury disagree" as to a witness' statement, the jury may have read back to them "that part of such witness' testimony on the point in dispute." The rule has been construed to mean that the jury is entitled to hear only the specific part of the testimony relevant to the point in dispute, and only when the jury notifies the court that it disagrees upon the statement made by the witness. *Aetna Casualty and Surety Co. v. Scott*, 423 S.W.2d 351, 354 (Tex.Civ.App.—Houston [14th Dist.] 1968, no writ); *J. H. Robinson Truck Lines, Inc. v. Ragan*, 204 S.W.2d 662, 664 (Tex.Civ.App.—Galveston 1947, writ ref'd n. r. e.).

The jury's response to the trial court's query seeking the identity of the witness and the specific nature of the witness' testimony that was in dispute amounted to nothing more than a request for a re-reading of practically all of the testimony of Myra Hill, Connie Hill, Robert Hill, and Marsha McKittrick. At no time did the jury indicate that it was in dispute as to any portion of the testimony of any of the witnesses. In the absence of disagreement between the jurors, the court was not obligated to have any witness' testimony read back to the jury, and accordingly, committed no error in refusing to do so. We have found no authority, and have been cited none, which required the court to direct the jury's attention to the provision of the rule in question. The third point is overruled.

■■■■ Appellants also seek a reversal on the ground that the court erred in refusing to enter a judgment against Marsha McKittrick, because a prior default judgment had been entered against her. In this regard the record reveals that after McKittrick had failed to file an answer, the court entered an interlocutory judgment by default against her. Appellants therefore take the position that they were entitled to a judgment against her in the amount assessed by the jury.

Under the terms of the final judgment, the court rendered a take-nothing judgment against appellants in favor of all appellees, including McKittrick. The judgment does not mention the prior interlocutory judgment rendered against McKittrick, and to this extent the final judgment in her favor conflicts with the prior interlocutory judgment against her. The general rule is that the entry of a final judgment inconsistent in its terms with a prior interlocutory judgment operates to set aside the interlocutory judgment. *Dickerson v. Mack Financial Corp.*, 452 S.W.2d 552, 555–56 (Tex.Civ. App.—Houston [14th Dist.] 1970, writ ref'd n. r. e.); *Kemp v. Harrison*, 431 S.W.2d 900, 905–06 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref'd n. r. e.). Consequently, the final judgment in the present case had the effect of setting aside the prior interlocutory judgment against McKittrick.

It has been held that the trial court has the discretionary power to change its mind about the entry of a default judgment and may amend it or set it aside on its own motion prior to the entry of the final judgment where there has been no severance. *Dickerson v. Mack Financial Corp.*, supra; *Kemp v. Harrison*, supra; *Prince v. Peurifoy*, 396 S.W.2d 913, 916–17 (Tex.Civ.App.— Dallas 1965, no writ).

■■■■ Appellants' cause of action was founded upon a conspiracy in which McKittrick was alleged to have been a participant. Inasmuch as appellants failed to discharge their burden of establishing the existence of a conspiracy, the determination of whether the default judgment should be set aside or carried forward to final judgment was within the sound discretion of the trial court. Under the facts and circumstances of this case, we hold that no abuse of discretion was shown. Appellants' fourth point is overruled.

■■■■ By their fifth and final point of error, appellants urge that the trial court erred in assessing a $30,000.00 guardian ad

litem fee against them, or alternatively, in failing to assess such fee solely against appellant Robert Hill. Under the record before us, we have concluded that the action of the trial court in assessing the court cost, which included the $30,000.00 guardian ad litem fee, must be sustained. Accordingly, the fifth point of error is overruled.

The record reveals that at the time of the trial, appellant, Robert Ashton Hill, was a minor. Upon the request of appellee, Ash Robinson, the trial court appointed a guardian ad litem to represent him at the trial.

In the final judgment appellees were awarded a recovery against each of the appellants for all costs incurred in the case. The judgment recites that the court costs were to include attorney's fees incurred by and through the appointment of Charles R. Browning, Attorney at Law, as guardian ad litem for Robert Ashton Hill, in the amount of $30,000.00, and that all costs were taxed against appellants.

Our rules provide that when a minor is a party to a suit and the court determines that the appointment of a guardian ad litem is necessary, the court shall allow the guardian ad litem a reasonable fee for his services to be taxed as a part of the cost. Tex.R.Civ.P. 173. Our rules further provide that the successful party to a suit shall recover from his adversary all costs incurred therein. Tex.R.Civ.P. 131. In the instant case, appellees were the successful parties and had a right to recover the costs. While the costs might have been apportioned otherwise, the assessment of costs is within the discretion of the trial court. *Coleman v. Donaho*, 559 S.W.2d 860, 864 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ dismissed as moot). We fail to perceive how it could be said that the action of the trial court in adjudging the cost against appellants amounts to an abuse of discretion.

Even if appellants' complaint could be deemed to have some merit, we would be powerless to grant the relief asked, because appellants failed to call the attention of the trial court to the matter by motion to retax the cost or in any other manner. It has been repeatedly held by our courts that before a party can complain on appeal of the cost being taxed against him, he must show that he objected or made a motion to retax the cost in the trial court. See 15 Tex.Jur.2d *Costs* sec. 74 (1960). In the present case no effort was made in the trial court to have the matter of the cost reassessed before resorting to this court. Appellants, having failed to call the matter to the trial court, may not raise such question for the first time on appeal. *Goslin v. Beazley*, 339 S.W.2d 689, 700 (Tex.Civ.App. —Houston 1960, writ ref'd n. r. e.); *Carmichael v. Williams*, 268 S.W. 502, 505 (Tex. Civ.App.—Galveston 1924, writ dism'd). In order to properly preserve the complaint for appellate review, appellants had the burden of either objecting or filing a motion in the trial court seeking a reassessment of the cost. In the absence of such objection or motion and an adverse ruling thereon and a proper assignment of error in their motion for new trial complaining of the adverse ruling, this court is without authority to consider the point. *Swearingen v. Myers*, 143 S.W. 664, 667–68 (Tex.Civ.App.—Amarillo 1911, writ ref'd).

The judgment of the trial court is affirmed.