Lavina ROGERS, et al., Appellants,

v.

RICANE ENTERPRISES, INC., et al., Appellees.

No. 07-91-0058-CV.

Court of Appeals of Texas, Amarillo.

April 29, 1993.

Rehearing Overruled May 26, 1993.

Robert P. Baxter, Jr., for appellants.

Walter G. Pettey, III and Stephen G. Gleboff, Hughes & Luce, C. Medferd Owen and Tom Scott, Bullock, Scott, Neisig & Owens, Paul New, Dennis R. Burrows, McCleskey, Harriger, Brazill & Graf, A. Andrew Gallo, Pat Helton, Warren G. Tabor, Jr., Tabor & Tabor, Charles C. Self, Whitten, Hacker, Hagin, Anderson & Rucker, Richard L. Husen and Dan Hook, Hook & Husen, Robert Motsenbocker, for appellees.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

BOYD, Justice.

Appellants [1] bring this appeal from a take-nothing judgment in their trespass to

---

1. Appellants, suing as shareholders and as successors in interest of the disenfranchised West-

try title and conversion action against appellees.[2] In the suit giving rise to this appeal, appellants sought to recover the working mineral interest under an assignment of an oil and gas lease insofar as it covers a 329.3 acre tract out of approximately 7,893 acres covered by the base lease. As a basis for their action, appellants assert they are entitled to all rights held by the Western Drilling Company[3] (Western) under the assignment in question on the ground that the assignment is still valid and in full force and effect. For reasons hereinafter expressed, we affirm the judgment of the trial court.

On May 31, 1937, Carrie Slaughter Dean, as lessor, entered into an oil and gas lease with P.N. Wiggins, Jr., as lessee, covering approximately 7,893 acres (base lease). The base lease included a habendum clause, which stated that Wiggins was "TO HAVE AND TO HOLD [the 7,893 acres] ... for a term of ten (10) years from [May 31, 1937] ..., hereinafter referred to as the primary term, and as long thereafter as oil and gas ... is produced...." The base lease further provided that if "the leased premises shall be hereinafter owned in the severalty or in separate tracts, the premises, nevertheless, shall be developed as one lease...."

Additionally, the lease provided that after expiration of the primary term, upon cessation of production, the lessee would have 60 days within which to commence drilling a new well, or attempt to restore production from the existing well. If commenced and prosecuted with reasonable diligence within this period, the lease would continue in effect as long as production continued. The assignment of the lease in whole or in part was expressly allowed.

Production was achieved on the base lease within the primary term. Subsequently, Superior Oil Company (Superior) acquired the base lease. On June 1, 1949, Superior assigned the lease above a depth of 5200 feet on a 329.3 acre portion of the base lease on which there was no production to Western and Leonard Latch. Western and Leonard Latch then conveyed a one-third interest to F.R. Jackson. Provisions in the assignment recited:

THIS ASSIGNMENT IS MADE SUBJECT TO THE FOLLOWING CONDITION AND PROVISION:

1.

All of the right, title, interest and privileges herein conveyed to and conferred upon Western will cease and terminate and shall revert to and revest in Superior, unless within thirty (30) days after the datehereof [sic], Western shall commence the actual drilling of a well for oil and gas upon the above described land and at a location thereon which shall satisfy any then existing offset obligation....

2.

Western shall and hereby does assume and agree to perform and discharge all of the [base] lease obligations, express or implied.... To this end, it is recognized by the parties hereto ... that there now are a number of ... off-set wells which Western shall protect against by the drilling of properly located wells on the above described land, in due and proper

---

ern Drilling Company, Inc., are Lavina Rogers; K.W. Cecil, Jr.; E.W. Cecil, Individually and as Independent Executor of the Estate of Michael Cecil, deceased; Linda K. Cecil Edwards; Norma Jean Rogers Choate; John Campbell Rogers; and Robert Richard Rogers.

**2.** Appellees, the asserted working interest and overriding royalty interest owners in, and purchasers of production from, the 329.3 acre mineral leasehold that forms the basis of this litigation, are Richard Scurlock, Individually, and Ricane Enterprises, Inc.; Brock Resources, Inc. (formerly Argonaut Energy Corporation);

Willbros Energy Services Company (formerly Cordova Resources, Inc.); Amoco Production Company; Pride Pipeline Company; Mobil Oil Company; Lea Refining Company (formerly Southern Union Refining Company); Southern Union Company; Meyer, Moritz & Company, Inc.; Jerry Moritz, Individually; Torreyana Oil Corporation; Opeco Energy, Inc.; Tom Meredith; J.C. Craft; Calvin J. Ortego (doing business as Tego); Patrick L. Helton; and Allen Harrison.

**3.** The Texas Secretary of State forfeited Western's corporate charter on July 19, 1965.

time, and subject to all of the applicable provisions of this Agreement.

\* \* \* \* \* \*

5.

In the event that the production of oil, gas or other hydrocarbon substances is developed on the above described leased premises by Western, and Western desires to abandon or cease operating the same, Western shall notify Superior in writing of such desire, and Superior may, at its election, require Western to transfer and assign to Superior or to its nominee all of Western's right, title and interest inand [sic] to said lease, together with the well or wells located thereon and together with such equipment used in connection therewith which Superior may desire to acquire....

\* \* \* \* \* \*

7.

Upon the termination of the rights of Western hereunder and/or with respect to the above described lease, as herein and in said lease expressly provided, or otherwise, Western shall deliver to Superior upon demand, a good and sufficient quit-claim deed and release. Any delay, failure or refusal on thepart [sic] of Western to deliver any such quit-claim and release shall in no way prevent such rights from terminating, and reverting to and revesting in Superior as herein expressly provided and contemplated.

Latch and F.R. Jackson assigned their interest in the assignment to Western in 1955 and 1956. All parties have agreed that Western is the common source of title to the subject property. Western immediately drilled and completed a single well, the Carrie Dean B No. 1 well, which was marginally productive and subsequently ceased production sometime in July 1961. It was then converted to salt water disposal. All parties agree that no additional wells have been drilled by Western or its shareholders on this tract from 1961 to the present.

On August 23, 1960, just prior to the cessation of production, E.P. Campbell (Campbell), the president of Western, sign-ing in his individual capacity, conveyed to the Dakota Company, Inc. (Dakota) "all of [his] right, title and interest ... as conveyed to [him] by assignment[ ] of record in Cochran County, Texas, in and to" the Dean lease "insofar as said lease covers the North 329.3 acres" to which the assignment applies. Campbell was an officer and stockholder in Dakota. Dakota in turn gave Campbell a promissory note for $250,-000 and a deed of trust which Campbell shortly thereafter transferred to the Union Bancredit Corporation (Bancredit). Dakota defaulted in payment of the note and, on August 6, 1963, J. Tom Lash executed a substitute trustee's deed to Bancredit. Through subsequent transactions, an assignment was made to Torreyana Oil Company, which successfully completed a new producing well on the 329.3 acres in October 1979.

On July 19, 1965, the Texas Secretary of State forfeited Western's corporate charter, giving rise to appellants' position that they, as shareholders and as heirs of shareholders, stand in Western's shoes as successors to all interests belonging to the defunct corporation. In 1984, appellants brought this trespass to try title action to recover possession of the working interest on the 329.3 acre tract. They also sought damages for conversion of oil and casing-head gas produced or purchased from the property by appellees.

It is undisputed that the base lease remains in effect because of continuous production on other parts of the base lease. On that basis, appellants argue that their rights under the 1949 partial assignment also remain in effect regardless of the long period of inactivity, because Western satisfied the only condition in the assignment, the commencement of drilling for oil and gas within 30 days of the date of the assignment.

After a lengthy, complicated, and hotly contested trial, the case was submitted to the jury by 18 questions with accompanying instructions. Those questions, the instructions accompanying them, appellants' objections to the questions, and the jury's answers to the questions will be discussed

sequentially as necessary to the determination of this appeal.

Appellants challenge the trial court judgment in 91 points of error. The disposition which we make of this appeal makes a verbatim listing of all the points unnecessary. The dispositive points will be referred to and discussed as may be necessary in our determination.

■ Appellants' points 1–50 and 89 pertain to perceived errors in the trial court's charge to the jury. In their first reply point, appellees contend that appellants waived all objections. Appellees argue that objections that are "obscured or concealed by voluminous unfounded objections, minute differentiations or numerous unnecessary requests" are untenable. *See* Tex.R.Civ.P. 274.

In support of their contention, appellees point out that appellants' objections to the court's charge cover 32 pages (over 775 lines) of the statement of facts. Appellees cite *Monsanto Company v. Milam*, 494 S.W.2d 534, 536 (Tex.1973), and other cases of like ilk holding that the length and multiplicity of objections justified their being overruled.

In the *Monsanto* case, the court pointed out that there were over 150 objections to that charge covering 42 pages of the transcript. In affirming the trial court's decision to overrule the objections, the court emphasized that the soundness or seriousness of most of the objections were not made on the basis of any complaint in the appellate court. The court explained that *Monsanto* "singles out from the voluminous objections and distinctly expands and particularizes on the one general objection that there 'are no pleadings to warrant the submission' which was leveled at each of the issues." *Id.* at 537. According to the court, although the "field of battle" was distinctly pointed out to the appellate court, it was not so indicated to the trial court. Thus, the court concluded, it could not be asserted "that the trial court, though cognizant of the ground of complaint, nevertheless chose to submit the issues." *Id.* at 537.

However, the instant case was lengthy and involved many evidentiary problems. While the making of such prolix and convoluted objections is not to be encouraged, considering all the surrounding circumstances we cannot say that, generally, they were not sufficient to alert the trial judge of matters about which complaint was made. Accordingly, we will consider those objections meeting the requirements of Rule 274, which are relevant and necessary to a proper disposition of this appeal.

■ In a trespass to try title suit, the plaintiff must recover on the strength of his own title. Thus, for appellants to establish title, they must show that Western fulfilled the terms of the Superior assignment. That is, appellants must show that at the time Western lost its corporate charter, the corporation still had good title to the land. The resolution of the dispute between the parties demands a determination of the requirements of the assignment from Superior to Western, Western's fulfillment or non-fulfillment of those requirements, and the effect of such fulfillment or non-fulfillment.

In an earlier appeal in this case styled *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76 (Tex.1989), the supreme court reversed a summary judgment in favor of Ricane Enterprises, Inc. and others, which involved the working interest in question here. Reference to that decision and its import in this appeal will be made later as necessary.

■ The rules governing the construction of an instrument such as the Superior assignment are well established. In construing an instrument of this type we should ascertain, and give effect to, the intention of the parties as gathered from the entire instrument, together with the surrounding circumstances, unless that intention is in conflict with some unbending canon of construction or is repugnant to the terms of the grant. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *R & P Enterprises v. LaGuarta, Gavrel & Kirk*, 596 S.W.2d 517, 518 (Tex.1980); *Praeger v. Wilson*, 721 S.W.2d 597, 601 (Tex.App.— Fort Worth 1986, writ ref'd n.r.e.); *South-*

*west Savings Association v. Dunagan,* 392 S.W.2d 761, 767 (Tex.Civ.App.—Dallas 1965, writ ref'd n.r.e.). The instrument must be considered as an entirety and each paragraph must be considered with reference to every other paragraph so that the effect of one on the other may be determined. *See Coker v. Coker,* 650 S.W.2d at 393. It must be presumed that each provision was placed in it for a particular purpose and a construction which would render any provision meaningless should be avoided. *Coker v. Coker,* 650 S.W.2d at 393. Provisions which are in apparent conflict must be reconciled and harmonized wherever possible so that the instrument as a whole may be given effect. *Holmes v. McKnight,* 373 S.W.2d 541, 546 (Tex.Civ. App.—Corpus Christi 1963, no writ); *Dilbeck v. Bill Gaynier, Inc.,* 368 S.W.2d 804, 807 (Tex.Civ.App.—Dallas 1963, writ ref'd n.r.e.).

Application of the above tenets compels the conclusion that the purpose of the Superior assignment was to attain by the use of reasonable diligence the exploration, development, and production of minerals in the acreage subject to the assignment. To this end, the assignment obligated Western, and Western agreed, to commence the actual drilling of a well within thirty days after the date of the assignment, to drill other and properly located wells in due and proper time to protect against existing offset wells, and to perform all of the incorporated Dean lease obligations. The Dean lease required the lessee to conduct good faith drilling operations upon the cessation of production.

Appellees contend that Western lost its estate in the premises by an abandonment of purpose. They argue that because Western lost its title, appellants cannot establish title through Western. Appellees rely upon the hoary case of *Texas Co. v. Davis,* 113 Tex. 321, 254 S.W. 304 (1923). *Davis* involved an oil and gas lease with a primary term of 25 years.[4] The lessee commenced drilling operations and produced oil for seven years, but subsequently ceased operations (drilling or production) because of financial difficulty. Four years after operations had ceased, and still within the primary term, the lessor leased the property to another operator who began production. Claiming the lease was still in force, the successors in interest to the initial lessee brought suit for the oil recovered by the subsequent lessee.

The *Davis* court held the true purpose of the lease was the profitable production of oil and gas, and the true consideration to be received by the lessor was the expected royalties. After production commenced, this purpose created an implied duty upon the lessee reasonably to develop and to explore the premises and the failure to fulfill this duty was a terminable event which caused the lease to revert to the grantor. *Id.,* 254 S.W. at 309.

In 1929, in an opinion authored by the same judge who wrote the opinion in *Texas Co. v. Davis, supra,* the Texas Supreme Court decided *W.T. Waggoner Estate v. Sigler Oil Co.,* 118 Tex. 509, 19 S.W.2d 27 (1929). In the *Waggoner* case, the lessor brought suit to cancel a 3,000 acre lease with a five year primary term which had been continued by production from only two wells on the leased acreage. The supreme court pointed out that an oil and gas lease invests the lessee with a determinable fee title to the oil and gas in place, a title which is lost when the land is no longer used for oil and gas exploration, production, and development. Thus, it reasoned, the only condition germane to the continued viability of the lease was the express condition of continued production. That express condition was satisfied by the production from two wells. *Id.,* 19 S.W.2d at 29.

In view of that continued production, the *Waggoner* court refused to find an implied *condition* reasonably to develop and explore further the leasehold. Rather, it found an implied contractual duty to continue development with reasonable diligence, and, it held, because that obligation is a covenant, its breach is not an act of forfei-

---

4. The lease did not contain a dry-hole provision, now common in oil and gas leases, which per- mits the lessee to resume payment of delay rentals within the primary term.

ture. Instead, the court observed, "the usual remedy for breach of the lessee's implied covenant for reasonable development of oil and gas is an action for damages, though, under extraordinary circumstances—where there can be no other adequate relief—a court of equity will entertain an action to cancel the lease in whole or in part." *Id.,* 19 S.W.2d at 29.

In reaching its decision, the *Waggoner* court noted the decision in the *Davis* case, but distinguished it on the basis that in *Davis* there had been a complete cessation of the use for which the estate was granted, (*i.e.,* no drilling or searching for minerals after cessation of production in the primary term) whereas in *Waggoner,* there was continuing production from the two wells in the secondary term.

In considering the question before us, and because of its discussion of the implications of *Davis* and *Waggoner,* the supreme court's discussion in *Mon–Tex Corporation v. Poteet,* 118 Tex. 546, 19 S.W.2d 32 (1929) is instructive. This is particularly true inasmuch as that case was authored by the same justice who authored the opinions in the *Davis* and *Waggoner* cases and was handed down the same day as the *Waggoner* case.

In the *Poteet* suit, the appellees had, inter alia, sought cancellation of an existing lease upon which there were two producing wells because of the breach "of the implied obligation for the reasonable exploration, development, and production of the oil and gas on the land, after their discovery," as well as cessation of use and abandonment of the premises. The trial court determined that the evidence conclusively negatived the cessation of use and abandonment of the property but entered judgment cancelling the lease. It did so because it felt the evidence raised, and it negatively decided, an issue whether the appellants had used reasonable diligence in exploring for and producing oil and gas from the premises. *Id.,* 19 S.W.2d at 33–34.

In the course of its opinion, the court stated that the law was definitely settled in this area by its decisions in the *Davis* and

*Waggoner* cases. En route to reversing the trial court, and, as material here, it stated:

> Fourth. *While the estate granted by the lease could be lost either by abandonment or by cessation of the use of the leased land, by the lessees or their assign, for the purposes of exploring for, developing, and producing the oil and gas in the land,* yet the uncontradicted evidence in this record negatives the abandonment by said parties of the interests granted to them by defendants in error, and also negatives cessation of use of the land by the Mon–Tex Corporation or its predecessors for the purposes of oil and gas exploration, development, and production.

*Id.,* 19 S.W.2d at 34. (emphasis added).

In the prior appeal of this case, without discussing the import of paragraph 7 of the Superior assignment, the supreme court held that Western's obligation under paragraph 2 of the assignment was a covenant to develop, not a condition. Citing the *Waggoner* case, it went on to recognize the established rule that the usual remedy for the breach of such a covenant was to award damages, or, in extraordinary cases, an appropriate decree of cancellation. *Rogers v. Ricane Enterprises, Inc.,* 772 S.W.2d at 79.

■ Ordinarily, such a cancellation decree would take the form of an alternative or conditional decree, requiring the grantee to do those things necessary to fulfill its obligations under the implied covenant within a specified time or suffer cancellation.

■ Historically, to obtain such a decree, in addition to showing that an action for damages does not provide an adequate remedy at law, the party seeking such relief must also show that a defendant does not intend to develop the leased lands as contemplated by the terms of the agreement in question. *Rendleman v. Barlett,* 21 S.W.2d 58 (Tex.Civ.App.—Austin 1929, writ ref'd).

■ Recapped, the teaching of these cases is that Texas courts have recognized

a very limited right to terminate for breach of a covenant to develop. A party seeking such relief bears the onerous burden of showing (1) the grantee has abandoned or ceased to use, and does not intend to develop, the premises for the purposes of exploring for, developing, or producing oil and gas, (2) a reward of damages would not provide an adequate remedy at law, and (3) an alternative or conditional decree requiring the defendant to fulfill its obligation under the covenant within a specified time or suffer cancellation also would not provide an adequate remedy at law.

Jury Questions 9 and 11 bear upon the "abandonment of purpose" or "cessation of use" theory of the *Davis* and *Waggoner* cases we have discussed above. Those questions, and the jury's answers, are as follows:

*Question No. 9.*

Did Western abandon or cease operating the leased premises which are the subject of this suit?

Answer "Yes" or "No"

Answer: Yes

*Question No. 11.*

Do you find that Western Drilling Company, Inc. abandoned the purposes for which the 1949 Assignment and Agreement from Superior Oil Company was made?

Answer "Yes" or "No".

Answer: Yes

In their first through tenth points, appellants argue the trial court erred in submitting Question 9 because (1) the supreme court had determined appellees' legal theory represented by the question was not applicable and that decision represented the law of the case; (2) abandonment of an oil and gas lease is not recognized under applicable Texas law; (3) the question is not material to any ultimate issue in the case; (4) it violates the rules required by the supreme court for the construction and interpretation of appellants' title under the 1949 Superior assignment; (5) it submits a mixed question of law and fact; (6) it fails to require the jury to find Western's desire or subjective intent to abandon or cease operating; (7) it fails to require the jury to

find any applicable conditions precedent to answering the question affirmatively and ignores requests for admission conclusively establishing the necessary conditions precedent were not satisfied; (8) the question is in conflict with the prior ruling of the trial court in granting appellants' fifth motion for partial summary judgment finding that the Superior assignment had not terminated; (9) the question conflicts with previously entered orders of the trial court granting appellants' judgment against certain defendants in the case and it also conflicts with the facts established conclusively against such defendants by reasons of their failure to answer requests for admission; and (10) the evidence established as a matter of law that Superior and appellees waived any right to terminate and have ratified and/or estopped to deny the continued existence of the 1949 Superior assignment.

In their twenty-third through twenty-ninth points, appellants challenge the submission of Question 11. In each of these points except their twenty-seventh point, appellants contend the trial court erred in submitting the question over their timely objections (abandonment of/cessation of use for the "purposes" of the 1949 Superior Oil Assignment) and in denying their motion for instructed verdict as well as their motion for judgment and judgment n.o.v. and to disregard the answer to Question 11, and their motion for new trial. They also contend (23) our supreme court in the prior appeal determined the legal theory in Question 11 is not applicable as a defense to appellants' title claims and the doctrine of the law of the case applies; (24) the question is not material to any ultimate issue for the reason that a special limitation for "abandonment of purposes" or "cessation of use" as a matter of law cannot be implied in the Superior assignment under the rules of construction required by the supreme court; (25) the question is a mixed question of law and fact; (26) Question 11 conflicts with a prior ruling of the trial court in granting appellants' fifth motion for summary judgment finding the Superior assignment had not terminated; (27) the question conflicts with previously en-

tered orders of the trial court granting appellants' judgment against certain defendants in the case, and conflicts with certain facts established against those defendants by reason of a failure to answer requests for admissions; (28) the evidence conclusively established that appellees and Superior waived any alleged right to terminate; and, (29) the "purposes" which appellees claim were abandoned by Western under the Superior assignment were expressly made the subject of covenants and not special limitations, thus, the question is immaterial to any ultimate issue in the case concerning title to the subject property.

■■■■■ We disagree that the prior decision of the supreme court in this case determined that the special limitation rule, enunciated by the court in the *Davis* and *Waggoner* cases and their progeny, was not applicable in this case and that such a determination represented the law of the case. It is axiomatic that the doctrine of the law of the case applies only to questions of law and does not apply to questions of fact. The doctrine does not necessarily apply when either the issues or the facts presented at successive appeals are not substantially the same as those involved in the first trial. *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex.1986). Its application is addressed to the discretion of the court and determined according to the particular circumstances of the case. *Kay v. Sandler*, 704 S.W.2d 430, 433 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.); *Governing Bd. v. Pannill*, 659 S.W.2d 670, 680–81 (Tex.App.—Beaumont 1983, writ ref'd n.r.e.).

In the summary judgment appeal, the case was not fully developed. Since that time the pleadings have been amended, additional parties involved, and voluminous additional testimony taken. In its reference to the *Waggoner* case, the supreme court recognized the rule which we have discussed. *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d at 79. The question before the court at the time was whether, under the record then before it, summary judgment was proper. The effect of its decision was to remand the cause for a new trial on all issues properly presented at that new trial.

■■■■■ Appellants also argue the submission of these questions was erroneous because it conflicted with a prior ruling of the trial court in granting their fifth motion for summary judgment finding that "the Superior Lease of 1949 has not terminated." A final judgment is one that disposes of all parties and all issues in a lawsuit. *Schlipf v. Exxon Corp.*, 644 S.W.2d 453, 454 (Tex.1982). In determining whether a judgment is final, different presumptions apply depending upon whether the judgment follows a conventional trial on the merits or results from default or a motion for summary judgment. *Houston Health Clubs v. First Court of Appeals*, 722 S.W.2d 692, 693 (Tex.1986). Following a conventional trial on the merits, the judgment is presumed final. *North East Independent School District v. Aldridge*, 400 S.W.2d 893, 898 (Tex.1966).

■■■■■ However, the *Aldridge* presumption does not apply to summary judgments or default judgments. *Houston Health Clubs v. First Court of Appeals*, 722 S.W.2d at 693. Thus, an unappealable interlocutory partial summary judgment such as the one in question is not final, cannot support a res judicata plea, and is subject to change by the trial court both prior to and in its final judgment. *Mower v. Boyer*, 811 S.W.2d 560, 562 (Tex.1991); *Stroman v. Fidelity and Cas. of New York*, 792 S.W.2d 257, 259 (Tex.App.—Austin 1990, writ denied); *Hill v. Robinson*, 592 S.W.2d 376, 384 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.); *Dickerson v. Mack Financial Corporation*, 452 S.W.2d 552, 555 (Tex.Civ.App.—Houston [1st Dist.] 1969, writ ref'd n.r.e.).

Appellants also assert that appellees are estopped as a matter of law to assert termination of the 1949 assignment because of their and Superior's "course of conduct, waiver, ratification and estoppel." In their support of that proposition, they refer to a division order to the Mobil Oil Corporation dated November 1, 1979, executed by Superior, reciting that Superior owns a 1/16th of the 8/8ths overriding royalty interest. They

also refer to a title opinion dated March 23, 1983, in favor of the Argonaut Energy Corporation, which notes that Superior owns a ⅟₁₆th of the ⅝ths overriding royalty interest and contains a reference ot the assignment from Superior to Western. We note the opinion's reference that "instruments in the chain of title, after examination, put one on notice that Western Drilling Company, Inc. may have violated the provisions of their agreement with Superior Oil Company." It also recites that in view of the execution of a prior partial release of acreage "could be evidence that Superior Oil Company had taken a positive position with regard to their ownership."

They also refer to a title opinion dated August 31, 1983, in favor of Meyer, Moritz & Company, et al., which refers to a gap in title from Western and refers to the overriding royalty interest in Superior, and to the abstracts of title which show appellees' title flows through Superior. As additional support, they also refer to portions of their cross-examination of appellees' witness Maston Courtney in which they sought to establish actions of Superior amounted to a recognition of the continued viability of Western's interest. Predictably, the witness did not acknowledge that theory.

■ In advancing this proposition, appellants rely upon cases such as *Greene v. White*, 137 Tex. 361, 153 S.W.2d 575 (1941). These cases recognize the rule that recitals in title instruments which recognize the validity of title claims of third parties, can estop the makers of those instruments from later assailing the title of those third parties. Suffice it to say, we do not find the record shows any such recognition by Superior of Western's interest sufficient to prevent appellees from raising the issue of abandonment of the purposes of the Superior assignment.

Appellants next argue Questions 9 and 11 improperly submit mixed questions of law and fact. They assert Question 9 does not define for the jury legal "abandonment" or "operating" in an oil and gas business. They also posit that Question 11 requires the jury to determine the purpose of the unambiguous 1949 assignment, thereby invading the province of the court.

Citing *Sun Exploration and Production Co. v. Jackson*, 783 S.W.2d 202 (Tex. 1989), appellants initially emphasize the rule that there is no duty on the part of an operator for additional operations and drilling without a reasonable expectation of profit. *Id.* at 204. They theorize that the rule is applicable here and without such an instruction, the jury could not properly decide whether Western had ceased operating the leased premises. We disagree.

The *Sun Exploration* case originated because the company sought judgment affirming the validity of an oil and gas lease it held covering a 10,000 acre tract of land in Chambers County. The lessors counterclaimed alleging a breach of implied covenants to reasonably develop and explore the entire lease and sought cancellation of the lease. Sun Exploration had drilled a well resulting in the discovery of a reservoir commonly known as the Oyster Bayou Field from which production continued. The basis of the lessors' claim was that Sun Exploration had only developed the Oyster Bayou Field which produced from a small part of the 10,000 acre tract and had neglected to explore and develop the larger remaining part of the lease. *Id.* at 203.

It was in that context that the court held that no implied covenant of further exploration exists independent of the implied covenant of reasonable development which requires the lessor to continue development only if there is a reasonable expectation of profit. *Id.* at 204.

The questions in the *Sun Exploration* case and this one are not analogous. The determinative question in this case is whether Western abandoned or ceased to operate the premises, rather than whether it should have to continue development after initial production. Thus, the suggested instruction was not required nor was expert testimony of that type required.

Appellants also cite *Loomis v. Gulf Oil Corporation*, 123 S.W.2d 501 (Tex.Civ. App.—Eastland 1938, writ ref'd), for the proposition that mere nonuse of property even for a long time is not abandonment or

desire to cease operating. That case involved an instrument which the court found conveyed an indefeasible legal title to the minerals. That being true, the court held that the owner of such an estate could not be divested of title by mere nonuse. We do not find that decision persuasive under the situation presented by this record.

◼ The terms "abandon," "cease operating" and "abandoned" are words of common import and understanding. Under this record, they did not require a technical explanation. In view of the fact that it is undisputed that neither Western nor its shareholders have drilled additional wells since production ceased in July 1961, and its charter was forfeited in July 1965, we do not agree the record requires submission of a jury question as to Western's desire or subjective intent to abandon or cease operating. The language of Questions 9 and 11 sufficiently complied with the Tex.R.Civ.P. 277 admonition that broad-form questions should be used whenever feasible. Appellants' first through tenth and twenty-third through twenty-ninth points are overruled.

◼ In their seventy-second and seventy-fourth points, appellants attack the legal and factual sufficiency of the evidence to support the jury answers to Questions 9 and 11. The rules governing the determination of the validity of such attacks are well established. A "legally insufficient" point is a "no evidence" point presenting a question of law. *Raw Hide Oil & Gas v. Maxus Exploration*, 766 S.W.2d 264, 275 (Tex.App.—Amarillo 1988, writ denied). In deciding that question, an appellate court must consider only the evidence and its inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *Raw Hide Oil & Gas v. Maxus Exploration*, 766 S.W.2d at 276. If such a point is sustained by us, then the finding is disregarded. In reviewing a "factually insufficient" point, we must weigh and consider all the evidence, including any evidence contrary to the finding. *Raw Hide*

*Oil & Gas v. Maxus Exploration*, 766 S.W.2d at 276. If we determine that the evidence supporting the finding is so weak or the answer so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust, the finding under attack may be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); *Raw Hide Oil & Gas v. Maxus Exploration*, 766 S.W.2d at 276.

◼ In support of the jury's findings, there is evidence that: (1) Western's corporate charter was canceled in 1965; (2) its records were lost; (3) its shareholder ledger was lost; (4) its president executed instruments purporting to dispose of the property; (5) its lease records were placed in an unprotected warehouse; (6) no contact of any kind was kept with the premises; (7) the former shareholders and their descendents asserted they did not know and had no way of knowing what was happening on the land; (8) Keith Cecil, Jr., the person charged by the shareholders with the responsibility of settling the affairs of Western, testified that it was his intent to pay the Internal Revenue Service and "get the hell out of Dodge."

Considered as a whole, the evidence was sufficient to justify the findings of the jury. Appellants' seventy-second and seventy-fourth points are overruled.

Logical continuity requires that we next consider appellants' fifty-first through fifty-fifth points. In response to Jury Question 1, the jury found that Western has been since at least 1960, and was, the owner of all or part of the title to the subject property. In Question 2, they found that interest to be a one-third working interest. In their fifty-first and fifty-second points, appellants contend that the trial court erred in disregarding the answer to Question 1. Appellants contend there was sufficient evidence to support the answer, and the record was sufficient to establish as a matter of law that Western was the owner of all or a part of the premises. In their fifty-third point, appellants argue that the trial court erred in failing to disregard the

answer to Question 2 insofar as the jury found that Western owned only a one-third interest, inasmuch as appellants were entitled as a matter of law to all of the title, thereby making the jury's answer immaterial to the ultimate issue of title. In their fifty-fourth point, they contend that the jury finding that there was no lost deed from Western to E.P. Campbell made the jury's answer immaterial to the ultimate issue of title. In their fifty-fifth point, they contend that the evidence was legally, or in the alternative, factually insufficient to support the jury answer to Question 2.

The thrust of appellants' arguments under these points is that appellees were on notice of Western's ownership through the recordation of the Superior assignment. Since there was no conveyance from Western and, since appellees' theory of termination through abandonment is not viable, they reason, their claim to title became conclusive because Western was the admitted common source of title to all parties. We disagree.

For the reasons which we have discussed above, the implied special limitation rule articulated in the *Davis* and *Waggoner* cases and their progeny is a viable theory. We have also found the evidence sufficient to support the answers to the questions embodying that rule. The question then becomes whether the trial court erred in disregarding the answers to Questions 1 and 2, and in entering the take-nothing judgment.

It is established that a court is under a duty to reconcile conflicting jury findings if reasonably possible in light of the pleadings and evidence, the manner in which the questions were submitted, and in view of other findings when considered as a whole. *Huber v. Ryan*, 627 S.W.2d 145, 145–46 (Tex.1981); *Signal Oil & Gas v. Universal Oil Products*, 572 S.W.2d 320, 326 (Tex. 1978); *Butler v. Joseph's Wine Shop, Inc.*, 633 S.W.2d 926, 933 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.). Considering the pleadings and the evidence, the manner and order in which the questions were submitted, and the charge in its entirety, we cannot fault the trial court in its performance of its duty. Appellants' fifty-first through fifty-fifth points are overruled.

It next becomes necessary for us to consider appellants' ninetieth and ninety-first points. In their ninetieth point, appellants contend that the trial court erred in prohibiting their lead counsel from making objections during a portion of the trial, thereby violating principles of fundamental fairness and due process in violation of the Texas and Federal Constitutions.

 Appellants cite no authority for this contention. The general rule is that the failure to present authority to maintain a point at issue waives the point. *Tobias v. University of Texas*, 824 S.W.2d 201, 207 (Tex.App.—Fort Worth 1991, writ denied), *cert. denied*, —— U.S. ——, 113 S.Ct. 966, 122 L.Ed.2d 122 (1993); Tex.R.App.P. 74(f). Even so, the rule is that a presiding judge has broad discretion with respect to the manner in which control of a trial is maintained and as to the examination of witnesses and a judgment will not be reversed unless probable prejudice is shown. *Texas Emp. Ins. Ass'n v. Garza*, 557 S.W.2d 843, 845 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.). Appellants have not shown in what way this ruling of the trial court harmed their cause. That being true, they have not shown the requisite probable prejudice to them because of the ruling. Appellants' ninetieth point is overruled.

In their ninety-first point, appellants contend the trial court erred in "disregarding the prior rulings of the Texas Supreme Court in this case and disregarding its own orders and rulings and entered judgments and disregarding Defendants' failures to answer Requests for Admissions, all without any motion to set aside any of such orders or any other prior notice or fair opportunity to allow plaintiffs to defend and prosecute their lawsuit," which course of conduct, they contend, also violated the concept of the rule of law and constitutional guarantees of fundamental fairness and due process.

In support of this point, appellants rely upon the decision in *Union Carbide Corp. v. Moye*, 798 S.W.2d 792 (Tex.1990). That

case was a mandamus action arising out of the action of the trial judge in overruling a motion to transfer venue. It was an action in which over 2,000 plaintiffs alleged harm from exposure to toxic chemicals around the Lone Star Steel plant in Morris County. The relators were most of the 400 defendants in the case who had filed a motion to transfer venue on the basis that an impartial trial could not be had in Morris County. The trial court handed down a discovery order reciting the parties' agreement concerning the designation of expert witnesses to testify at the venue hearing. At the time the trial judge had scheduled the venue hearing, he had stated he expected the hearing might last as long as eight weeks.

However, on the day the hearing was scheduled, the plaintiffs filed a motion opposing oral testimony. After allowing the defendants less than 24 hours to respond, the trial court sustained the motion and refused to permit oral testimony. The supreme court noted that the defendants were taken by surprise because they had anticipated an eight-week hearing and had not arranged to have all of their evidence immediately available at the start of the hearing. The trial judge denied a motion for continuance and instructed the defendants to "present what you have now."

It was in this context that the supreme court held the trial court implicated itself in misleading the defendants regarding the format for proof and thereby deprived the defendants of their fundamental due process right to notice and a hearing. Implicit in the appellate court's decision was that the trial court erred in not granting a motion for continuance to allow defendants additional time within which to prepare their case under the changed format.

We have examined this lengthy record and do not find the trial court's action in changing any interlocutory decisions or in its conduct of the trial deprived appellants of their due process. It is significant that appellants never sought a continuance because of any such actions. Appellants' ninety-first point is overruled.

The disposition of the points which we have made removes the necessity for dis-

cussion of appellants' remaining points, since their resolution would not change the proper disposition of the appeal. Tex. R.App.P. 90(a). It is a well established rule in this state that in a trespass to try title suit such as this one, the plaintiff must recover on the strength of his own title and if he fails to do so, the effect of a take-nothing judgment is to vest title in the defendant. Since we have determined that under this record, appellants failed to establish their title, we must, and do hereby, affirm the judgment nunc pro tunc giving rise to this appeal.